(No. 14424.—Decree affirmed.)

JOSEPH PILLSBURY *et al.* Appellants, *vs.* GEORGE BRUNS
*et al.* Appellees.

*Opinion filed February 22, 1922.*

1. DEEDS—*existence of fiduciary relation does not necessarily
render deed invalid.* The existence of a fiduciary relation does
not avoid a conveyance unless by reason of the relation undue
advantage is taken of the grantor, and it is not ground for set-
ting aside a deed shown by the evidence to have been made by
the grantor with full knowledge of its nature and effect and be-
cause of his deliberate, intelligent and voluntary desire.

2. SAME—*existence of a fiduciary relation casts burden upon
grantee to prove the fairness of the transaction.* The existence
of a fiduciary relation merely creates a presumption of influence,
which casts on the person occupying the relation, and who is the
recipient of a voluntary conveyance, the burden of showing good
faith on his part, that the transaction was fair, equitable and just,
and that he did not abuse or betray the confidence reposed in him.

APPEAL from the Circuit Court of Sangamon county;
the Hon. E. S. SMITH, Judge, presiding.

T. W. QUINLAN, and A. F. BERNARD, for appellants.

THOMAS D. MASTERS, and B. L. CATRON, for appellees.

Mr. JUSTICE DUNN delivered the opinion of the court:

George Gardner, a bachelor eighty-three years old, was
the owner of his home farm of ninety-six acres and an-
other eighty-acre tract of land, both situated in Sangamon
county. He executed a deed while on his death-bed, on
June 14, 1919, conveying the ninety-six acres to George
Bruns and Ruth Bruns, his wife. A week later he died in-
testate. His heirs were his four sisters, three of whom died
within a year, and the survivor, together with the heirs
of the deceased sisters, filed a bill for the partition of the
ninety-six acres as well as the eighty acres, alleging that
at the time of the execution of the deed for the former

tract the grantor was not of sound mind but was incapable of transacting business and understanding the nature of the transaction and was procured to make the deed by the undue influence of George and Ruth Bruns, who sustained a fiduciary relation to him. George and Ruth Bruns answered the bill. The cause was referred to the master, who took and reported the evidence with his conclusions, finding the issues for the defendants. The court overruled exceptions to and approved the master's report and entered a decree for the partition of the eighty acres, dismissing the bill as to the ninety-six acres. From that part of the decree which dismissed the bill as to the ninety-six acres the complainants have appealed.

George Bruns had been a tenant of the premises for four years before Gardner's death. Previous to that time Gardner had lived alone on the premises. He had sometimes drunk to excess and was unclean in personal habits. After Bruns became his tenant Gardner continued to live on the premises, making his home with Bruns and his wife. He was taken sick in the latter part of May, 1919, and A. W. Barker, a physician from Springfield, was called to attend him, and saw him thereafter until Gardner died every day except three or four when Dr. Barker was away and Dr. Bernard saw Gardner in his place. The circumstances under which the deed was made were testified to by Dr. Barker and Thomas L. Jarrett, the lawyer who prepared the deed and took the acknowledgment. Dr. Barker testified that on June 14 Gardner told him that he wanted the doctor to call for a lawyer to make a deed. He wanted Mr. Jarrett or Mr. Catron. He said that George Bruns' family had made him a good home and he wanted to deed some land to him; that his relatives did not care anything for him and Bruns and his family had made him the best home he ever had. He wanted Barker and Dr. Bernard to come back when the lawyer came, as witnesses. Barker went to the lawyer's office and told Jarrett of Gardner's re-

quest. Jarrett went to Gardner's house the same afternoon. He testified that Mrs. Bruns let him in, took him to the room where Gardner was, and said, "Here is Mr. Jarrett." Gardner spoke to him, called him by name and asked him to shut the door. Jarrett did so. Mrs. Bruns was not in the room. Gardner told Jarrett to make out a deed for the home place to George and his wife; that they had made him a good home while there; that he was indebted to them and wanted what property he had to go to them; that if he knew he was going to die he would give the Bruns' the other eighty acres, but he might get well and want it. Jarrett asked Gardner if anyone had asked him to do it, and Gardner said no,—that it was nobody's business,—and told him to go to another room and get a tin box that was on the table. Jarrett got the box and set it beside Gardner, who unlocked it. They opened the box together and got out a deed. Gardner said, "That is not the deed," reached over and got another deed and told Jarrett to draw a deed and convey that property to George and his wife, and if he got well he wanted the rents of the place. Jarrett went into an adjoining room and prepared the deed. When it was completed the doctors had arrived. Barker and Jarrett testified as to what then occurred. Bernard did not testify in the case. Jarrett testified that he asked the doctors to examine Gardner, and they did so, and stated in Gardner's presence that in their judgment he was capable of transacting business. Jarrett then told Gardner he had the deed prepared; that it was a deed of the home place, and read it over to him, and Gardner said he knew what he was doing; that the Bruns' had taken care of him for the last five or six years through his sickness and he wanted to compensate them for what they had done. Jarrett then propped Gardner up in the bed, with his back against a pillow on the back of an inverted chair, got an old geography to use as a desk, lifted up Gardner's hand on the geography and Gardner started to write. He said that his hand was

so shaky that he could not write and asked Jarrett to steady his hand. Jarrett did so, holding Gardner's wrist while he wrote his name. Jarrett then certified the acknowledgment of the deed and handed it to Gardner, saying, "Here is the deed; do what you want with it." He asked the doctors and the lawyer if they thought the deed could be set aside, saying he wanted these people to have it. Jarrett told him that so far as he knew it could not be set aside; that he had witnesses to show that he was capable of transacting business. Gardner then asked the doctors to sign as witnesses, and they did so. Gardner called for George Bruns, but he was not there. He had someone call Mrs. Bruns and said to her, "Ruth, here is the deed to the home place; I want you and George to have it; you have been kind to me and have taken care of me." She thanked him and went out crying. Barker testified that the two doctors reached the house while Jarrett was writing the deed, and Barker went to Gardner's room and talked with him. Bernard and Jarrett came in, and the latter asked Gardner if anyone had influenced him to make the deed. Gardner said no one had,—it was his own wish. Jarrett read the deed to Gardner, who took the pen in his hand and Jarrett helped steady his hand. Both Barker and Jarrett were of the opinion that Gardner was capable of transacting business and of protecting his interest. Their testimony is in no way discredited, unless the testimony which was introduced as to Gardner's mental capacity and the relationship between him and George Bruns be regarded as tending to do so.

On the question of mental capacity there was the usual diversity of opinion among the witnesses. During the last few years of his life Gardner did not farm his land but leased it to tenants. He made the contracts himself with his tenants and had written leases prepared for execution. He permitted his tenants to farm the land rented, without interference, and it does not appear that there was ever any reason for interference or that he suffered any loss. He

had little business to transact but such as he had he transacted himself. The produce from his land he sold himself, going with his tenant to the elevator and receiving a check for his part of the produce. In 1917 he contracted for the building of a corn-crib and granary, bought the lumber which the carpenter said would be required, through Bruns, and when the work was done paid the carpenter the contract price. In 1918 he employed the same carpenter to build another crib with a covered driveway between the two, bought the lumber and paid the contract price ($125) with his check.

Henry Schlicht was a tenant of Gardner for eight or nine years before 1917. He testified: "I rented from him on shares. I put in the crops myself. He said to suit myself about putting in crops. This happened every year that I farmed on the ground. Whenever I would raise a crop and it come time to sell it or I would think it was a good price I would tell him and we would go down and sell it. I would sell mine and he would sell his. That happened every year up to 1915. I would check up the price. He asked me to, and I would look over the accounts. I would sometimes do it at my house and sometimes at his. I thought he was going down mighty fast the last three or four years of his life. He could hardly get in and out of a buggy. He had to use his hands to get up out of a chair. He never supervised my farming in any way. He never came to my farm when grain was divided. We tended to all that. I met him on the road several times. He would be walking and talking to himself. Sometimes I would see him sitting at the school house and talking to himself as if there were three or four people around him. That happened between 1909 and 1917. I have seen him eat. Sometimes he would eat as if he could not get enough and would talk to himself while eating. He kept batch a number of years. I did not see him very much the last two years of his life. I didn't see him at all away from

the place. I did not see him by himself. Mr. and Mrs. Bruns were always around. He usually got up about ten or eleven o'clock and went to bed at twelve or one. I don't know what he did. I saw him one time sitting up late. He was not reading,—just stared at me like he was afraid when I went in. He was never clean in his person. * * * I visited him once during his last illness. He was pretty weak and was in bed. * * * I saw George Gardner in town last time before he was sick. I called at his house in the afternoon. I was not there over half an hour. I sat there and looked at him. I spoke to him, and every time I said anything George Bruns or his wife would take the conversation away and he never spoke to me after. I asked how he was getting along, and he would say first rate. I said I hoped he'd get along all right when I left. * * * Every written lease of the land was prepared by George Gardner and he transacted the business with me as landlord. * * * I have an opinion as to whether George Gardner was capable of transacting ordinary business in June, 1919. In my opinion I don't think he was. * * * My opinion is based on his appearance."

The facts stated in this testimony are not sufficient to justify the conclusion that Gardner was incapable of transacting business. They show that he was physically weak and failing but not that he was mentally incapable. In fact, it appears that he did transact his business and there was no suggestion that it was not properly done. There was other evidence by a number of witnesses of substantially this same character. On the other hand, there was the testimony of a greater number of witnesses having equal opportunities of observation that Gardner was capable of transacting ordinary business understandingly.

Gardner kept an account at the State National Bank of Springfield. He made deposits of his funds received from the sale of grain or other sources and drew checks. When he made a deposit or drew a check he usually had the presi-

dent, who was his relative by marriage, prepare the deposit slip or write out the check, which he signed. In the absence of the president he would depend on the cashier, or sometimes the teller, for that purpose. He had a tin box in which were his papers, which he kept at the bank. His account was a constantly growing one, and amounted at the time of his death to $10,000 or $12,000. Joseph F. Bunn, the cashier and afterward president of the bank, among other things testified in regard to Gardner's condition: "I had a conversation with him the last time he was in the bank, less than a year before he died. I tried to carry on one but it was a little hard. I just asked him how he felt. Usually he did not feel good. His answer was responsive, as far as that was concerned. Whatever he would answer you could understand it. He was not talkative. He would not say much. That is not an indication of inability to transact business. He displayed interest in his bank balance as far as I know. In his box he kind of fumbled around. Mr. Gardner drank to excess sometimes in years gone by. I knew that. He seldom came to the bank when he was drunk. He got drunk after he left the bank. Always came there sober. Seems to me he took his bank book away. It was in the box a good deal of the time. I think in the latter part of his life it was in the box the greater part of the time. He could always understand. He would hear you. You could tell by the fact his answers were responsive and intelligent. I can't place my last conversation with him. I think he died in 1919. He was in along the first part of that year,—five or six months before he died. He usually answered the questions. He was kind of indefinite,—mind cloudy sometimes."

It would serve no good purpose to set out in detail the testimony of each witness. From all the evidence it appears that Gardner was an old man in a feeble physical condition, whose intellectual powers had never been brilliant and whose habits were not pleasing, who had lived a num-

ber of years alone and who was not talkative, though he had acquired a habit of talking to himself. He was slow-speaking and slow-thinking. Someone was usually with him when he transacted the few business affairs which the condition of his property involved, and he frequently accepted the services of such a one. The evidence does not indicate that he did not understand the business in hand or that he made any mistake in regard to it. He was unable to render much, if any, assistance in the preparation of his income tax return or farm report. He was ignorant and not of a high order of intelligence but he was acquainted with his own property. He had intelligence enough to accumulate a substantial sum in cash, and it is not evidence of an unsound mind that he appreciated the change from his previous condition and wanted to reward generously the people with whom he had found a pleasant home in the last years of his life. The finding that he was of sound mind is in accordance with the weight of the evidence.

It is argued for the appellants that a fiduciary relation existed between Gardner and Bruns and that therefore the deed was *prima facie* void. Conceding for the sake of the argument the existence of a fiduciary relation, a deed would still be held valid which was entered into with full knowledge of its nature and effect and because of the deliberate, voluntary and intelligent desire of the grantor. (*Valbert* v. *Valbert,* 282 Ill. 415.) The existence of a fiduciary relation does not avoid a conveyance unless by reason of the relation undue advantage is taken of the grantor. (*Lang* v. *Lang,* 284 Ill. 148.) As in the case last cited, so here the plan of conveying the property to appellees was without their suggestion or advice but originated with Gardner and was carried out by him without consultation with the appellees. The existence of a fiduciary relation merely creates a presumption of influence, which casts on the person occupying the fiduciary relation the burden of showing the

absence of undue influence by showing good faith on his part, that no unfairness was used, and that the transaction was equitable and just between the parties. The party claiming the benefit of the contract must show that he has acted in perfect good faith and did not abuse or betray the confidence reposed in him. In this case there is no word of evidence of influence brought to bear upon the grantor to procure the execution of this conveyance. He himself said that no one had suggested it to him. Neither of the grantees was present at the execution of the instrument, and there is no evidence that they had ever requested it or had any knowledge of the grantor's intention. The purpose he expressed was to compensate them for having made a home for him since Bruns had been his tenant. Whether they had any legal claim on him for compensation does not appear from the evidence, and certainly they had not to the amount of the value of the land conveyed to them, but the grantor had a right to measure their deserts from him,— not by his legal liability but by his own generosity and gratitude. While the deed purports to be for the consideration of one dollar and past services, it was, in fact, to a large extent voluntary. There is no rule of law which prohibits a grantor from making a gift to one who stands in a confidential relation to him, provided the gift is made voluntarily and is not procured by a betrayal of the trust. Evidence that the donor was deficient in mental capacity is proper to be considered, together with the presumption of undue influence arising from the existence of the relation, but the evidence completely rebuts the presumption of undue influence by establishing that the appellees had no connection with the transaction until the delivery of the deed to Mrs. Bruns, that the making of the deed originated with the grantor, and that he had the mental capacity to know and appreciate the nature and effect of his act.

The decree will be affirmed.            *Decree affirmed.*