(No. 20064.—

ANNA HASLINGER *et al.* Appellees, *vs.* GEORGE GABEL,
Appellant.

*Opinion filed April 23, 1931—Rehearing denied June 3, 1931.*

WARNOCK, WILLIAMSON & BURROUGHS, (SELMAR A. BLEISCH, and DONALD B. WARNOCK, of counsel,) for appellant.

WILLIAM P. BOYNTON, for appellees.

Mr. COMMISSIONER EDMUNDS reported this opinion:

This is a suit in chancery to set aside a deed executed by Mary Schorr, widow and devisee of Conrad Schorr. Conrad died in 1903 and at the time of his death owned the land involved. Conrad and Mary had no children. By his will Conrad bequeathed the sum of five dollars to the child or children of his deceased brother Wilhelm, the same amount to the child or children of his deceased sister Anna, and the same amount to the child or children of his deceased sister Kunigunda. He then devised and bequeathed the remainder of his estate to Mary for life, with power to sell and dispose of it as she saw fit and proper. In the deed in question, which was executed by Mary on May 25, 1926, George Gabel, appellant, was named as grantee. Mary died on October 31, 1926. The bill to set aside the deed

was filed in the circuit court of Madison county on November 4, 1926, by Anna Haslinger, surviving daughter of the above mentioned Kunigunda, together with Phœbe, Walter and John Fischer, children of a deceased daughter of Kunigunda, their claim being that the land in question passed under the law as intestate property and descended to the heirs of Conrad. The cause was referred to a master and testimony was given by seventy-six witnesses. The master found the equities to be with the complainants. The chancellor overruled exceptions to the master's report and entered a decree granting the relief prayed. From this decree Gabel has appealed.

The land involved borders the Mississippi river near the city of Wood River. Conrad and Mary lived upon and farmed it for many years prior to 1903. A large portion of it was subject to overflow at high water. After Conrad's death Mary continued for many years to live upon it alone. The record does not disclose what, if any, income she received therefrom during this time. During the last ten or twelve years that she was on the farm she lived in a two-room house that stood about twenty-five feet from the State road between Alton and St. Louis. While there is some conflict in the testimony as to the nature of this house and the manner in which she there lived, the weight of the evidence is clearly to the effect that the building, crudely constructed in the first instance, had become dilapidated and that it was meagerly furnished and without any conveniences whatever. Because of age and physical infirmities Mary became unable to get about as much as formerly and while living there she was more or less dependent upon such old friends and neighbors as Mrs. Guth and Mrs. VanHemelen, who came in to see her and who from time to time gave assistance by way of cooking, seeing that she had water and a fire in cold weather and procuring groceries for her. From time to time she paid these women for at least some of the services which they performed. With respect to

these things the master made a finding that after the death of Conrad, Mary "continued to reside on said premises in a small house, where she lived amid very humble surroundings, without any modern conveniences, and was often during said period of time dependent upon neighbors or passers-by for necessaries and such comforts of life as could be furnished her at that place."

Before 1923 appellant was the proprietor of a store in Wood River, dealing in feed, flour, meat, poultry, potatoes, and occasionally other kinds of produce. This business was carried on in a two-story brick building erected by appellant in 1920, in the business part of town. All of the down-stairs and a portion of the up-stairs were used in connection with the business, and the remaining portion of the up-stairs was partitioned off and used by appellant as living quarters. In August of 1923 Mary left the farm and came to live with him in these quarters. While the record does not disclose their exact ages at that time, it is fair to conclude that Mary was about eighty and appellant was between sixty and seventy. The acquaintanceship between them arose out of deliveries of chicken feed, flour and other articles made by appellant to her on the farm. Several of appellees' witnesses testified to persistent efforts made by appellant to induce Mary to come and live with him, basing their conclusions upon statements allegedly made by Mary to them. Appellant makes no claim that she took up her abode with him uninvited. Appellees' witnesses gave considerable testimony which is claimed by appellees to have established that after moving there she lived "practically enslaved" in surroundings which "mocked at a common sense of decency and all but transcended the wildest stretch of fancy." Thus, testimony given by these witnesses tended to show that these living quarters consisted of only one roughly finished room, cold and frosty in the winter time; that vermin lurked in cracks of the floor; that there was no partition or curtain between her bed and that of appel-

lant; that flour sacks served as sheets and that the bed clothing was filthy; that there was no running water or toilet facilities in the room; that she was insufficiently clothed and that she did not get enough to eat. Some of these witnesses testified that she suffered from Bright's disease, inflammation of the bladder, heart trouble, and a condition which caused water to run from her limbs. There was also testimony tending to show that at times when she was sick no doctor was called.

While no denial was made of the plainness of the surroundings, the lack of running water up-stairs and the absence of toilet facilities there, in one way or another most of this testimony, in so far as it bore on the filthy and dirty condition of Mary and of the premises, the lack of food furnished to her and her alleged "enslavement," was controverted by that given by witnesses for appellant. Without stating this testimony in detail, it may be said that it showed, among other things, that during a considerable period, at least, of Mary's stay with appellant he had meals prepared in outside homes and brought in for Mary and himself; that in addition he purchased and brought in a variety of foodstuffs, including meat, fruits and bread; that he took these foodstuffs up-stairs; that on an average of three times a month he had washings done at a laundry; that in these washings were included bedding and various articles of woman's clothing and that he daily performed disagreeable duties in the way of emptying slops. So far as the matter of medical attention is concerned, the record discloses that three of appellees' witnesses who testified as to Mary's physical condition were doctors who treated her in 1926—Dr. Charles Pence in May and September, Dr. G. L. McKinny in May and August, and Dr. William E. Barton in June and October.

Other testimony given at considerable length by appellees' witnesses tended to show that Mary suffered from hallucinations and was mentally incompetent; that appellant

boasted that he was going to get hold of her farm some day; that he said he could get her farm for nothing; that he stated that he "was sitting on the top of the world now," and that he said Mary would do "most anything" he asked her to with reference to the farm. The testimony as to Mary's mental condition and hallucinations was controverted by that given by various witnesses for appellant. The master made a finding that Mary did have sufficient mental capacity to understand the nature and effect of the deed. A finding to the contrary would not have been warranted by the evidence. The testimony relating to the boasting alleged to have been done by appellant was directly contradicted on rebuttal, and the character of one of the witnesses who testified along this line was impeached. It is admitted that on December 13, 1924, Mary obtained a loan of $6200, securing it by a mortgage on the farm, and that she turned the money over to appellant. Joseph Slivka, a witness for appellees, testified he took Mary's acknowledgment; that she said it was "all right" and that she was "perfectly satisfied with it." There is evidence that some of this money was used to buy a tractor for the farm and to build a shed or barn there. Appellant paid off this loan on June 7, 1926.

In 1924, the year after Mary had moved to appellant's, she rented her farm to Henry Dalton, who testified that he negotiated with her for it up-stairs and with no one else around. Dalton further testified that there was no equipment whatever on the farm; that he furnished all his own implements and livestock; that he made final settlement with her in the spring of 1925, and that she at that time asked him if he wanted the place another year, he replying that he did not. Commencing with the spring of 1925 appellant managed the farm. The tax records of Madison county introduced in evidence showed that the taxes for 1923, paid April 25, 1924, were paid by Mary, and that the taxes for 1924, paid May 29, 1925, were paid by appellant. It was admitted that appellant paid the taxes thereafter.

The immediate circumstances surrounding the execution of the deed by Mary to appellant are disclosed in the testimony of D. H. Mudge, an attorney who had practiced in Edwardsville for over twenty years. He testified that in May, 1926, appellant came to him with an abstract, requesting him to examine it and asking him if it would be legal and proper for Mary to execute a deed to appellant; that witness understood from what appellant said that Mary was living in the premises occupied by appellant and had been for some time; that appellant consulted witness as to the propriety of making such a deed from a moral standpoint, and said if it was not proper he did not want it; that witness told appellant that witness saw no objection to the execution of such a deed if Mary was of sound mind and the other necessary elements were present; that he prepared the deed in controversy and at appellant's request took it to appellant's store building at Wood River; that appellant and Mary were there; that witness was there not to exceed an hour and not less than half an hour; that appellant was present part of the time and absent part of the time, witness being with Mary while appellant was absent; that witness told Mary what the instrument was and asked her if it was her wish to execute it, reading it to her and impressing her with the fact that it contained her entire farm; that she said she desired it; that she spoke kindly of appellant and said he had taken care of her for several years; that she spoke of the relatives of her deceased husband (naming them) and said in substance that they paid little or no attention to her and she was anxious they should not receive her property; that she said various real estate men had endeavored to purchase the property, but she wanted appellant and not them to have it; that she expressed the hope that appellant would not be given trouble on account of his receiving the deed; that she impressed witness as being a woman of unusual intelligence for her age and as being not only satisfied but exceedingly anxious that the conveyance

be made to appellant; that she requested witness to prepare some kind of an instrument for appellant's execution whereby appellant would make provision for her, and that witness did this. This instrument, signed by appellant, was introduced in evidence. It provided that whereas Mary had conveyed the farm to appellant, as part of the consideration for said conveyance he agreed to provide her "with a good and comfortable home in said township, to furnish and supply ample and abundant food, board and clothing in said home, also furnish and provide all necessary or desirable medical attention, nursing and medicine, all for and during the natural lifetime of the said Mary Schorr, and in all ways, manner and things to maintain, furnish and provide the said Mary Schorr for and during her lifetime any and all comforts and necessities of life essential and available at said place of residence. Said undersigned further covenants and agrees to pay all present taxes, assessments and other indebtedness or incumbrances on said real estate and to pay any and all indebtedness of the said Mary Schorr now outstanding and unpaid." Mudge testified that he kept the original of this instrument and was not certain whether he mailed a copy to Mary or appellant; that appellant requested witness to prepare a will for appellant, which was done in accordance with his instructions, and that such will was executed in witness' office the day after he took the acknowledgment of Mary's deed. This will was introduced in evidence. By its terms appellant devised and bequeathed all his property and estate to Mary and appointed her executrix without bond. Mudge further testified that appellant requested him to keep the will, and that Mary requested him to keep at least one of appellant's contracts for her support in witness' office, and that he had retained them in his possession until delivered to counsel in the present case.

The testimony of Mudge that Mary expressed herself as desirous that appellant should get her property and that she did not want her husband's relatives to have it was

not the only evidence bearing upon this phase of the case. Mrs. VanHemelen, who waited on Mary for three winters while she lived on the farm, during two of which winters she went in every morning to build Mary's fire and get her breakfast; Anton Mennemeyer, who often saw Mary sitting downstairs at appellant's place and who conversed with her a number of times in German; Mrs. Henrietta Wilson, who visited Mary both at her farm and at appellant's; James Fines, the tenant who took charge of her farm in 1926; Mrs. Ellen Taylor, who visited Mary up-stairs at appellant's; John F. Johnson, who had talked with Mary at the farm and at appellant's; Mrs. Grace Dwiggins, who got acquainted with Mary through buying feed at the store; Mrs. Artie Roff, proprietor of a hotel in Wood River, who bought provisions at appellant's store; Mrs. Jessie Sullivan, who cooked meals which were taken to appellant's; Martin Drenovac, a merchant who delivered groceries to Mary at the farm; Mrs. Guth, who helped Mary at the farm, and Robert Streeper, an undertaker, who prepared her body for burial, gave testimony which, as a whole, showed Mary was not on good terms with appellees because they had not cared for her, that she expressed herself as desirous that they should not get her property, and that she wanted appellant to have her farm in payment for what he was doing for her. Testimony of similar purport was given by certain witnesses called by appellees, including Lyman Price, a rural mail carrier, who delivered mail to Mary on the farm, and Mrs. Rosa Lehmaen and Mrs. Davis, who often saw Mary on the farm.

At least twenty-two witnesses called by appellant gave testimony tending to show that Mary made no complaint about her treatment or the conditions at appellant's and that she was satisfied there. Some of these witnesses testified to having heard her express a very high regard for appellant. A lesser number of witnesses testified in behalf of appellees to having heard Mary express dissatisfaction with

the conditions under which she lived there and to a hatred for appellant, coupled with resentment for the manner in which he treated her, one of these witnesses saying she had heard Mary call appellant a devil, and another saying she heard her say she was "treated like a dog." Leaving out of account the impeachment disclosed of record of certain of these witnesses of appellees, there is nothing which calls for the conclusion that their testimony is worthy of greater credence than that offered by appellant, and, in fact, that offered by appellant's witnesses is the more convincing and satisfactory. In so far as Mary's satisfaction with conditions at appellant's is material in this case, the weight of the evidence is to the effect that she was satisfied there.

In the light of our conclusion that the decision in this case does not necessarily turn upon the question as to whether there was or was not a fiduciary relation between appellant and Mary, there is no occasion for entering into a discussion of authorities dealing with the definition of such relation and it may be assumed that the master and chancellor were warranted in finding that such a relation existed. It is well settled that where a fiduciary relation exists the burden of proof is on the beneficiary of the instrument executed during the existence of such relationship to show the fairness of the transaction and that it did not proceed from undue influence. (*Allen* v. *McGill,* 311 Ill. 170; *White* v. *Smith,* 338 id. 23.) It is equally well settled, however, that even though a fiduciary relation does exist, a deed is nevertheless valid if entered into with full knowledge of its nature and effect and through the deliberate and voluntary desire of the grantor. (*Pillsbury* v. *Bruns,* 301 Ill. 578; *Neagle* v. *McMullen,* 334 id. 168.) The existence of a fiduciary relation does not render a conveyance void unless by reason of the relation undue advantage is taken of the grantor. (*Negley* v. *Ingleman,* 335 Ill. 52.) Mere advice, argument or persuasion does not constitute undue influence if the grantor acts freely when he exe-

cutes the deed, though the deed would not have been made except for the advice, argument or persuasion. To render a conveyance inoperative the influence exerted must be of such a nature as to deprive the grantor of his free agency. The mere fact that the grantee procures an attorney to prepare the deed does not prove that the deed was obtained by improper means. *Gregory* v. *Gregory*, 323 Ill. 380.

The chancellor found (1) that appellant agreed to provide Mary with a good and comfortable home, to furnish ample and sufficient food, board and clothing in said home, to furnish and provide all necessary and desirable attention, nursing and medicine during her lifetime, to pay all her debts, and in all ways, manner and things to maintain, furnish and provide her during her lifetime any and all comforts and necessities of life essential and available. He also found (2) that "the purported consideration was so inadequate as to amount to fraud on the part of the said George Gabel in the procurement of said deed, in view of fiduciary relations existing between him and said Mary Schorr, and that said George Gabel took undue advantage of said fiduciary relation." It is true that testimony was given to the effect that the growth of the oil refining industry in the vicinity of Wood River had made a portion of Mary's farm very valuable and that the property was worth around $38,000. It is impossible, however, to reconcile these two findings. In *Pillsbury* v. *Bruns, supra,* it was said: "There is no rule of law which prohibits a grantor from making a gift to one who stands in a confidential relation to him, provided the gift is made voluntarily and is not procured by a betrayal of the trust." In that case we pointed out that there was no evidence that the grantees had any claim on the grantor for compensation, and that certainly they had no claim to the amount of the value of the land which they received, but we concluded: "The grantor had a right to measure their deserts from him—not by his legal liability but by his own generosity

and gratitude." In *Winkelman* v. *Winkelman,* 307 Ill. 249, a father and mother about seventy-seven years of age conveyed to a daughter real estate worth around $100,000, the understanding being that the income therefrom was to be used for their support as long as they lived. There being no showing of undue influence or fraud on the grantee's part the conveyance was upheld. In *Finch* v. *Green,* 225 Ill. 304, it was said, speaking of services performed in caring for the grantor: "The services were of such a nature that they could scarcely be measured in money, and it was entirely competent for David Finch to place such a value upon them as he saw fit. His estimate of the value of such services would not be disturbed if the court should differ with him in judgment, nor would the court enter into an inquiry as to the adequacy of the consideration fixed by the parties themselves." At least one reason why the courts cannot attempt to provide a scale for weighing in dollars and cents the value of services performed in transactions of this nature was suggested in *Gallaher* v. *Herbert,* 117 Ill. 160, where it was said: "The consideration could not be measured by dollars and cents. The personal kindness and numerous delicate attentions demanded by the age and condition of the grantors in those cases and that they might expect from the affections of the grantees are not marketable commodities, and it was therefore impossible by mere money compensations to make the grantors whole." The chancellor having properly found a fair and comprehensive undertaking on the part of appellant to support Mary for the remainder of her life, it was not for him to hold that the transaction should be upset for the mere reason that the evidence tended to show the property was worth $38,000 rather than some lesser amount, even though a fiduciary relationship was present. The weight of the evidence here, as disclosed by the testimony of attorney Mudge and the many other witnesses whose statements are summarized above, is to the effect that Mary knew appellees would get

her property if they survived her unless she conveyed it to someone else in her lifetime; that she felt they were not interested in her welfare; that she had in mind that they did nothing for her; that she disliked them and intended to prevent them from getting her farm and that she intended that appellant should receive it in exchange for what he did for her. We said in *Campbell* v. *Freeman,* 296 Ill. 536: "The evidence also shows that he said he had given his own relatives all that he expected to give them; that Mrs. Freeman, a niece of his first wife, took excellent care of him and he proposed to give his property to her. It is but natural that he, having no one dependent upon him, should feel grateful for that care and reward the one giving it. That does not constitute undue influence." Considering the dislike which Mary expressed for her husband's relatives and her feeling that they had not helped her and taking into account her natural feeling of gratefulness for the care given her by appellant, her desire to cut off such relatives and reward appellant existed almost as a matter of course. It appearing in accordance with the weight of the evidence that the conveyance was deliberate and voluntary and that it was not procured by betrayal of any trust it should not have been set aside.

A further finding made by the chancellor was to the effect that appellant did not carry out the agreement to support and that there was therefore a failure of consideration. Assuming that the evidence demonstrated a failure of consideration, the right to have a conveyance set aside for that reason is purely personal to the grantor, and that right is not transferred to his heirs or devisees. (*Roche* v. *Roche,* 286 Ill. 336; *White* v. *Smith, supra.*) Appellees are therefore in no position to raise this point. Even though they could properly do so, they would be met by the well settled principle that a deed made in consideration of the support of the grantor will only be set aside where there has been an entire failure or refusal to perform the contract in re-

spect to such material matters as would render the performance of the rest a thing different from what was contracted. (*Ropacki* v. *Ropacki,* 341 Ill. 301; *Pittenger* v. *Pittenger,* 208 id. 582.) Courts in the construction of contracts look to the language employed, the subject matter and the surrounding circumstances. They are never shut out from the same light which the parties enjoyed when the contract was executed, and in that view they are entitled to place themselves in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them and so as to judge of the meaning of the words and the correct application of the language to the things described. (*Nash* v. *Towne,* 5 Wall. 699.) In determining whether proper support was furnished, the condition in life of the parties at the time the contract was made must be taken into consideration. (*Russell* v. *Robbins,* 247 Ill. 510.) Whatever may be said about the manner in which Mary lived at appellant's house, it cannot be viewed apart from the manner of life to which she had previously been accustomed and the condition of appellant's surroundings at the time she came there and took up her abode, and the state of the evidence is not such as to warrant the conclusion that appellant so failed or refused to perform the contract in material matters as to render the performance of the rest a thing different from what was contracted.

It follows that the decree of the circuit court must be reversed and the cause remanded, with directions to dismiss the bill.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Edmunds is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Reversed and remanded, with directions.*