LEONARD M. MCDONALD, REVIVED IN THE NAME OF JAMES R. MCDONALD, PERSONAL REPRESENTATIVE OF THE ESTATE OF LEONARD M. MCDONALD, APPELLEE, V. JAMES T. MCDONALD AND MARTHA MCDONALD, APPELLANTS.

298 N.W.2d 136

Filed October 31, 1980. No. 42940.

George H. Moyer, Jr., of Moyer, Moyer & Egley for appellants.

Edward E. Hannon of Cronin, Hannon & Symonds for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

KRIVOSHA, C.J.

The appellants, James T. McDonald and Martha McDonald, appeal from a judgment of the District Court for Wheeler County, Nebraska, which found that a certain conveyance made by James' mother, Mary D. McDonald, on December 28, 1974, was procured by undue influence and, accordingly, should be canceled and set aside. We believe that the record

will not support such a conclusion and, therefore, we reverse the decision of the trial court.

The grantor, Mary D. McDonald, and her husband, Charles W. McDonald, were the owners of a certain 80-acre tract of land located 11 miles south and 3/4 mile west of Ewing, Nebraska, and legally described as the west half of the northwest quarter of Section 3, Township 24 North, Range 9 West of the 6th P.M., Wheeler County, Nebraska. Mary McDonald and her husband lived on the 80-acre tract for most of their married life, Mary having acquired the 80-acre tract by inheritance from her father. The McDonalds had two children, Leonard, the appellee, and James, the appellant. The record establishes that James, who is 2 years older than Leonard, was told by his father that upon graduation from grade school, if he would not go on to high school and would stay at home and work with his father, he would have a farm of his own. James accepted the offer and worked with his father until he was 21 when he went into the Army. Upon his discharge in 1946, he returned to Wheeler County and resumed farming with his parents. In 1948, his father began the construction of a house on the 80-acre tract in question. After spending some $5,000 for the construction of the house, the father was unable to complete it and James spent $3,300 of his own money to complete the house which he constructed with a hired man when they were not otherwise engaged in farming operations. James testified that when he finished the house on the 80 acres in question, there was an understanding among him, his father, and his mother that the 80 acres would someday be his. James continued to farm with his father and mother until 1952 when, together with his wife, Martha, he moved to O'Neill. Apparently, James left the farm because he and his father did not get along.

In 1966, Leonard took up residence with his parents on the disputed 80-acre tract, which he farmed until 1975.

On December 27, 1974, while Mary was visiting James, James asked her if she was going to leave the 80 acres to him. Mary mentioned something about a will and James said he would feel better if she made a deed. He then told her he would call his lawyer, William Griffin, if she wanted to do anything and she said alright. The next evening, James took Mary to Griffin's office and left her there. He then went home and Griffin called him when they were finished. James then went back to Griffin's office and picked up Mary. When Mary and James returned to James' home, she gave the deed to James.

Leonard learned of the deed when he and Mary went to Bartlett, Nebraska, to pay taxes in 1975. Leonard told James he was unhappy about the deed and was going to do something about it. He did not, however, do anything about it during Mary's lifetime.

A fair reading of all the evidence discloses that both James and Leonard exercised influence over their mother. She was inclined to attempt to make either of them satisfied and to avoid conflict with them by doing whatever they requested. Her actions, however, do not appear from the record to be as a result of undue influence as described in the law, but rather by reason of her own personal desire to get along with her sons.

In beginning to review a case involving alleged undue influence, several basic principles must be kept in mind. In the first place, this being an equity action, this court is required to review the record de novo on appeal. *Hein v. M & N Feed Yards, Inc.*, 205 Neb. 691, 289 N.W.2d 756 (1980). Furthermore, in the recent case of *In re Estate of Saathoff*, 206 Neb. 793, 295 N.W.2d 290 (1980), we had occasion to set out the various factors and elements necessary to establish a case of undue influence. We said there: "'The elements necessary to be established to warrant the rejection of a written instrument on the ground of undue influence are: (1) That the person who executed

the instrument was subject to undue influence; (2) that there was opportunity to exercise undue influence; (3) that there was a disposition to exercise undue influence for an improper purpose; and (4) that the result was clearly the effect of such undue influence.' *Dunbier v. Rafert*, 170 Neb. 570, 103 N.W.2d 814 (1960) (syllabus of the court)." *Id.* at 798, 295 N.W.2d at 294.

We made it clear in *Saathoff*, however, that it is not mere influence which makes a conveyance unlawful but *undue* influence as established in the law. In that regard, quoting from *Kolc v. Krystyniak*, 196 Neb. 16, 241 N.W.2d 348 (1976), we said in *Saathoff* at 799, 295 N.W.2d at 295: "'[The] undue influence which will void a . . . (gift) is an unlawful and fraudulent influence which controls the will of the donor. The affection, confidence, and gratitude of a parent to a child which inspires a gift is a natural and lawful influence and will not render it voidable unless such influence has been so used as to confuse the judgment and control the will of the donor.'"

Likewise, in *Saathoff* we said that: "'The court, in examining the matter of whether a deed was procured by undue influence, is not concerned with the rightness of the conveyance, but only with determining whether it was the voluntary act of the grantor. The fact that the grantor has others who are proper subjects to receive his bounty can be considered by the court only as it bears upon the validity of the conveyance.' *Rule v. Roth*, 199 Neb. 746, 751, 261 N.W.2d 370, 373 (1978)." *Id.* at 799, 295 N.W.2d at 295.

Further, we are required to keep in mind that: "'In order to set aside an instrument or instruments . . . for want of mental capacity on the part of the person executing such instruments, the burden of proof is upon the party so asserting to establish that the mind of the person executing such instruments was so weak or unbalanced when the instruments were exe-

cuted that he could not understand and comprehend the purport and effect of what he was doing.'" *Id.* at 799-800, 295 N.W.2d at 295, quoting from *Dunbier v. Rafert,* 170 Neb. 570, 103 N.W.2d 814 (1960).

Finally, we have previously said that mere suspicion, surmise, or conjecture does not warrant a finding of undue influence, but there must be a solid foundation of established facts on which to rest the inference of its existence. This is particularly true where the parties are well aware of the existence of the contested deed shortly after its execution. See *Zych v. Zych,* 183 Neb. 708, 163 N.W.2d 882 (1969).

Our reading of the record fails to convince us that there is sufficient evidence which would clearly and convincingly establish that the grantor was of such mental condition at the time that the deed was executed that the conveyance was as a result of undue influence asserted upon her by her son James.

Testimony of Dr. Richard Fitch establishes that he was Mary's attending physician for several years up until her death. He testified that the only thing he ever noticed concerning Mary's mental state was that her hearing was bad and that sometimes communicating with her was difficult. He said there was only a slight decrease in her mental state from 1972 through 1975, so slight that it was not worthy of noting on her hospital records.

Rachel Vanconete, a niece of Mary's, testified likewise. She said that Mary was aware of the world around her and that Mary had no mental or memory failures. She further testified to a conversation she had with Mary in approximately March of 1977 regarding the disposition of Mary's estate. At that time, Mary told her that James would have the home place (the disputed land involved herein) because he had helped build the house.

Further, a sister of Mary's, Anna Schindler, testified as to a conversation with Mary about the disposition of

her estate. In that conversation, Mary said James was to receive the home place. Mrs. Schindler further testified that Mary's mind had not slipped; that she was capable of conducting her own business; and that she was not easily influenced. The record further establishes the fact that while Mary avoided conflict with her children, she nevertheless maintained an active life and was involved in a host of activities which would refute any claim of mental deficiency on her part sufficient to subject her to undue influence.

The only evidence to support the claim of undue influence is that of Leonard himself in which he testified that Mary was subject to his will and, to a lesser extent, to whatever James suggested. There is, however, no evidence in the record from which one can conclude that the requirements necessary to establish undue influence sufficient to void a deed were presented to the court.

Leonard further argues that we may infer undue influence because the attorney who drew the deed was James' attorney and not Mary's. The Illinois Supreme Court, in the case of *Haslinger v. Gabel*, 344 Ill. 354, 364, 176 N.E. 340, 343 (1931), observed: "The mere fact that the grantee procures an attorney to prepare the deed does not prove that the deed was obtained by improper means." We agree with that view. The record is totally devoid of any evidence to indicate what took place at the attorney's office. In any event, we cannot presume that the attorney aided in unduly influencing Mary.

We must, therefore, conclude that the grantor intended her act, for whatever reason, and we may not, therefore, frustrate that act by our own views. The appellee, having failed to introduce evidence sufficient to meet his burden and sufficient to establish with clear and convincing evidence the existence of undue influence, must fail in his efforts to set aside the deed. Accordingly, we must reverse the decision of the

trial court and direct that the court enter an order finding the deed valid and proper.

REVERSED AND REMANDED WITH DIRECTIONS.

CLINTON, J., not participating.