IN RE ESTATE OF DELPHINE WAGNER.
LYMAN WAGNER, GENEVIEVE BEERBOHM, LOIS ANN TANK, AND DEL NOR SAZAMA, APPELLANTS, V. DELPHINE WAGNER, APPELLEE.

367 N.W.2d 736

Filed May 17, 1985.    No. 84-457.

Ray C. Simmons of Simmons & Schneider, P.C., for appellants.

William G. Line of Kerrigan, Line & Martin, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

KRIVOSHA, C.J.

The appellants, Lyman Wagner, Genevieve Beerbohm, Lois Ann Tank, and Del Nor Sazama, four of the six children of the appellee, Delphine Wagner, appeal from an order entered by the district court for Dodge County, Nebraska, vacating a previous order entered by the county court for Dodge County appointing a conservator for Delphine Wagner and setting aside

a certain lease of land owned by her. We affirm the decision of the district court vacating the appointment of a conservator and reinstating the lease.

The appellants assign essentially two errors. One, that the district court reviewed the record of the county court proceedings de novo rather than for error appearing on the record as required by statute; and, two, that the evidence adduced at the hearing in the county court supports the action taken by the county court in appointing a conservator for Delphine Wagner.

The standard of review of an order either appointing or denying the appointment of a conservator under the provisions of Neb. Rev. Stat. § 30-2630 (Cum. Supp. 1984) is set out by statute. Neb. Rev. Stat. § 30-1601 (Cum. Supp. 1984) provides that "[i]n all matters arising under the Nebraska Probate Code, appeals shall be allowed as provided in sections 24-541.01 to 24-541.10 and 24-551." The manner for hearing, trying, and determining such appeals is set out in Neb. Rev. Stat. § 24-541.06 (Cum. Supp. 1982), which provides: "(1) In all cases other than appeals from the Small Claims Court, the district court shall review the case for error appearing on the record made in the county court . . . ." See, also, *In re Estate of Oltmer*, 214 Neb. 830, 336 N.W.2d 560 (1983). Even if we were to agree with appellants that the scope of review is for error appearing on the record, a question we do not in fact decide, we would not have any reason to reverse the decision of the district court. An examination of the record for error only and not for the purpose of making determinations anew leads to the inescapable conclusion that the record is devoid of evidence sufficient to permit the appointment of a conservator under the provisions of § 30-2630. Taking the evidence in a light most favorable to the appellants fails to support the appointment of a conservator.

As a result, we turn to what is really the only issue presented to us in this case, that is, whether the requirements of § 30-2630 were met so as to justify the appointment of a conservator for Mrs. Wagner.

While there are relatively few cases decided under the provisions of § 30-2630, the clear language of the statute and

cases decided under earlier statutes having similar purposes make it abundantly clear that one may not have his or her property taken away and placed in the hands of a conservator merely because potential heirs believe that there will be more left for them if the owner of the property is not free to deal with the property as he or she chooses. Before one may be subject to the control of a conservator, the requirements of the statute concerning the appointment of a conservator must be met. See, *Hyde v. Crocker*, 185 Neb. 428, 176 N.W.2d 234 (1970); *Cass v. Pense*, 155 Neb. 792, 54 N.W.2d 68 (1952). The requirements are clearly set out by statute in § 30-2630(2) and provide:

> (2) Appointment of a conservator or other protective order may be made in relation to the estate and property affairs of a person *if* the court *determines* that (i) the person is unable to manage his or her property and property affairs effectively for reasons such as mental illness, mental deficiency, physical illness or disability, advanced age, chronic use of drugs, chronic intoxication, confinement, or lack of discretion in managing benefits received from public funds, detention by a foreign power, or disappearance; *and* (ii) the person has property which will be wasted or dissipated unless proper management is provided . . . .

(Emphasis supplied.)

In its order appointing the conservator, the county court determined that Mrs. Wagner was unable to manage her property due to "advanced age, a continuing grief caused by the death of her husband, Roy Wagner, and the subtle direct undue influence of her daughter, Clarinda Foote, as well as the indirect influence of Clara Mae and Charles Lange." Notwithstanding the fact that the county court determined that Mrs. Wagner was unable to manage her affairs, the court, nevertheless, found and directed that she be paid the sum of $1,200 per month in order that she may "handle her day to day affairs and expenses." The reason for concluding that she was unable to manage her property due to those matters set out in the order but, nevertheless, was able to handle her day-to-day affairs and still to subject her to the appointment of a conservator under the language of § 30-2630 is difficult to

understand. Perhaps the county court was concerned with the manner in which Mrs. Wagner would choose to deal with her assets rather than whether she would be able to effectively manage them. If that was the case, the county court was in error.

Mrs. Wagner was 79 years of age at the time of the conservatorship hearing. Her husband, Roy, had died approximately 3 months prior to the institution of the proceedings. Advanced age alone, however, is not a basis for appointing a conservator. As we observed in *Cass v. Pense, supra* at 796-97, 54 N.W.2d at 73:

A guardian should not be appointed either of the person or property of an adult simply because he is aged or infirm or because his mind is to some extent impaired by age or disease. On the other hand the object of the statute under which this proceeding is brought is primarily the protection of property and if one does not possess sufficient mentality to understand in a reasonable manner the business he is transacting, or the nature and effect of his acts with reference to business affairs, or if he has lost his reasoning powers to such an extent that he is incapable of understanding or acting with ordinary discretion in common affairs and his property has thus become subject to loss or waste, then a guardian should be appointed to manage his affairs.

The evidence in this case establishes beyond any question that Mrs. Wagner possessed sufficient mentality to understand in a reasonable manner the business she was transacting and to know the nature and effect of her acts with reference to business affairs. As a matter of fact, it was her knowledge which apparently disturbed four of the children and caused them to seek the appointment of a conservator.

Dr. Roger Dilley, a specialist in internal medicine, testified that Mrs. Wagner had been a patient of his since 1978 and that he had seen her every 3 to 6 months for treatment of diabetes and hypertension. He testified that, in general, Mrs. Wagner was in good health, had not shown any evidence of problems with her memory, was well oriented, and answered questions appropriately, with good comprehension.

Dr. Philip G. McLeod, a clinical psychologist, examined Mrs. Wagner on October 19, 1983. The results of the tests conducted by Dr. McLeod and two of his associates disclosed no evidence that she was unable to handle her affairs. In one report she was described as "cleanly dressed in slacks, a blouse, and sweater. She had bathed and her hair was neat and combed. She maintained good eye contact and was friendly and cooperative. She did not cry when discussing her family but had a dejected look on her face." The report further indicated that "[t]he patient was spontaneously productive and answered questions in a logical manner. She was relevant and her associations were good in quality and continuity. She did not show any signs of delusional thinking, and no discontinuities were manifested in the stream of thought." And, further, the report noted, "[t]he patient is oriented to time, place, and person. Her insight is fair as she understands her motivations and her judgement has been good in the past and there was no evidence of poor decisions after her husband died." While the report noted that she appeared "depressed," one might conclude that such reaction was quite normal in view of the fact that four of her six children were attempting to have a conservator appointed for her and she was being examined by strangers in order to try and retain control over her own property. Any normal, healthy individual would undoubtedly have some sense of depression about that event.

As we very properly observed in *Cass v. Pense*, 155 Neb. 792, 796, 54 N.W.2d 68, 72-73 (1952):

It is inevitable that if life is prolonged to old age the advance of the years will be marked by greater or less decrease of bodily powers and mental efficiency. But generally if that course be normal, if it be such only as attends age unaffected by abnormal brain conditions, there will not be mental incompetency within the meaning of the law and nothing to justify a court in depriving a person involuntarily of the control of his property. The purpose of a guardianship of this kind has reference to the preservation of the property of the ward and any assistance he may personally require. The mere fact that he manifests the weakness, forgetfulness, and normal

characteristics of age is quite immaterial unless his debility has reached the stage where he cannot manage or intelligently direct the management of his affairs and his estate is liable to suffer material loss or waste for want of a responsible person in charge.

There is simply no evidence to support a conclusion that Mrs. Wagner is unable to manage her property because of advanced age. As a matter of fact, there is no evidence that she could not manage her property for any reason.

The only evidence presented in the trial regarding the management of property by Mrs. Wagner had to do with the leasing of some land by Mrs. Wagner to Scribner Alfalfa, Inc. The land leased to Scribner Alfalfa, Inc., had previously been farmed by Mrs. Wagner's son and son-in-law. The evidence established that the lease to Scribner Alfalfa, Inc., produced 160 percent greater income to Mrs. Wagner than did the leases to her son and son-in-law. This, in some manner, is intended to prove that she is unable to properly manage her own affairs. This logic is difficult to grasp. One of the children who sought the appointment of a conservator concluded that the transaction was evidence of mismanagement of Mrs. Wagner's affairs because by receiving more income for the land, Mrs. Wagner would be required to pay more income tax. Her son testified as follows:

Q. You don't know whether she is mismanaging it or not?

A. Oh, I can see she's mismanaging it. I can see that. I don't have to go over.

Q. How can you see that?

A. Well, she rented it to the alfalfa mill. That's not very good business. She's only one person, that's money she's going to have to give to Uncle Sam. If my dad would have wanted more money, he'd have asked for it.

Q. She rented it to the alfalfa mill for 160 percent of what you were paying and that was a bad business decision?

A. She ain't going to gain nothing.

Q. Because of the taxes?

A. That's right. . . .

The evidence regarding the lease to the alfalfa mill is hardly evidence of Mrs. Wagner's inability to manage her own property. Quite to the contrary, it indicated that she knew exactly what to do with her property. There is simply no evidence in the record to establish that Mrs. Wagner is unable to manage her property.

And, finally, the evidence with regard to undue influence is likewise insufficient as a matter of law. The order of the county court makes it clear that the county court had some difficulty with that claim. The finding is that one of the daughters, Clarinda Foote, was subjecting Mrs. Wagner to "subtle direct undue influence" and that a second daughter and son-in-law were subjecting Mrs. Wagner to "indirect influence."

Mere suspicion, surmise, or conjecture does not warrant a finding of undue influence; there must be a solid foundation of established facts on which to rest the inference of its existence. See *Craig v. Kile*, 213 Neb. 340, 329 N.W.2d 340 (1983). In order to prove undue influence, the children maintaining that such undue influence existed had the burden of proving (1) that Mrs. Wagner was subject to undue influence; (2) that there was opportunity to exercise undue influence; (3) that there was a disposition to exercise undue influence *for an improper purpose*; and (4) that the result was clearly the effect of such undue influence. See, *In re Estate of Massie*, 218 Neb. 103, 353 N.W.2d 735 (1984); *McDonald v. McDonald*, 207 Neb. 217, 298 N.W.2d 136 (1980). It is not mere influence that the court is to be concerned with, but *undue* influence as established in the law. See *In re Estate of Saathoff. Saathoff v. Saathoff*, 206 Neb. 793, 295 N.W.2d 290 (1980).

Dr. McLeod, who had examined Mrs. Wagner, specifically found that she did not appear to be one easily subject to undue influence. He testified as follows:

Q. Were you able to tell from the test and from the interview you did of Delphine Wagner, anything regarding her personality, whether she had a mind of her own, whether she would be influenced by others?

A. Yes. She looked like quite a strong-willed gal; has her own opinion. I don't know her past situation. May be somewhat opinionated; feisty. Those kind of descriptive

terms come to mind.

While the children who filed the petition seeking the appointment of a conservator maintained that their mother was subject to undue influence, they testified to the contrary. Mrs. Wagner's son, Lyman, testified as follows:

> Q. Your mother is too bullheaded. She makes up her own mind?
>
> A. She's stubborn. You can't talk to her.
>
> Q. And she sticks to it when she's made it up?
>
> A. Whether it's right or wrong.

A daughter, Del Nor Sazama, further maintained that Mrs. Wagner was being influenced by her daughter Clarinda. However, on cross-examination she testified as follows:

> Q. You have mentioned that Clarinda has been influencing Delphine. Is there any other way that she has influenced Delphine other than those that you have mentioned?
>
> A. No, not that I can think of.
>
> Q. So, in the matter of the funeral arrangements, is that correct?
>
> A. Well, she's been helping her in other ways, but I mean I can't — I don't have proof that she has. It's just my idea that she has been. She's there all the time.
>
> Q. Helping her do things that - - -
>
> A. She's probably telling mom how to do everything.
>
> Q. Do you know that for a fact?
>
> A. No, I do not. But, I'm sure she is. Because I've never seen Clarinda in my life just sit there and keep her mouth shut. She's always got some opinion.
>
> Q. Do you know for a fact that Clarinda has been influencing your - - -
>
> A. Not for a fact, no. Just knowing Clarinda, I think she is.

That supposition falls far short of the evidence necessary to establish undue influence.

It is apparent that what we are confronted with in the instant case is a situation in which Mrs. Wagner's husband, for many years, for whatever reasons, permitted several of his children to use land belonging to the Wagners at less than market rental and

that upon his death Mrs. Wagner determined to become a better business person. This caused a change in the arrangements which several of her children had previously enjoyed and, for that reason, caused dissension in the family. An effort, however, to relieve dissension is not grounds for the appointment of a conservator.

The district court was correct in concluding that an examination of the record failed to disclose sufficient evidence as a matter of law to justify the appointment of a conservator or to set aside the lease between Mrs. Wagner and the Scribner Alfalfa mills. The judgment of the district court is therefore in all respects affirmed.

AFFIRMED.