IN RE GUARDIANSHIP AND CONSERVATORSHIP OF MAUDE
CLEVENGER SIM.
MAUDE CLEVENGER SIM, APPELLANT, V. EDITH WRIGHT AND
OPAL C. COMISKEY, APPELLEES.
IN RE ESTATE OF MAUDE CLEVENGER SIM.
MAUDE CLEVENGER SIM, APPELLEE, V. EDITH WRIGHT AND OPAL
C. COMISKEY, APPELLEES, ALAN M. WOOD, GUARDIAN AND
CONSERVATOR, APPELLANT.

403 N.W.2d 721

Filed April 10, 1987. Nos. 85-422, 85-922.

Harvey A. Neumeister, Kent J. Neumeister, and J. Patrick Green, for appellant Sim.

Richard H. Hoch of Hoch & Steinheider, for appellees Wright and Comiskey.

Alan M. Wood, guardian and conservator.

Robert M. Spire, Attorney General, and Ruth Anne Evans, for amicus curiae State.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

CAPORALE, J.

## I. INTRODUCTION

These cases, which were consolidated for argument on the court's own motion, arise from a petition by Edith R. Wright and Opal C. Comiskey to have a guardian and conservator appointed for their 87-year-old half sister, Maude Clevenger Sim, with whom they share a common father. The cases constitute the third and fourth appearances of this matter in this court. In the first appearance, *Sim v. Comiskey*, 216 Neb. 83, 341 N.W.2d 611 (1983), we affirmed the district court's dismissal of the effort by Sim's attorneys to enjoin the county court proceeding which ultimately led to the designation of Alan M. Wood, a member of the bar of this state, as Sim's guardian and conservator with limited powers, a designation the district court later affirmed but modified by eliminating the limitations, and now appears before us the third time as case No. 85-422, *In re Guardianship and Conservatorship of Maude Clevenger Sim*. In the second appearance, *In re Guardianship and Conservatorship of Sim v. Comiskey*, 216 Neb. xxvi (case No. 83-873, Jan. 23, 1984), we dismissed as premature (that is, for lack of jurisdiction) the appeal taken by Sim's attorneys from an order of the county court which appointed physicians

to examine Sim. In the remaining, or fourth, appearance, case No. 85-922, entitled *In re Estate of Maude Clevenger Sim*, the designated guardian and conservator appeals the district court's refusal to issue letters of appointment. For the reasons hereinafter discussed, we affirm as modified the judgment of the district court in case No. 85-422 and dismiss as moot the appeal in case No. 85-922.

## II. FACTS

In the summer of 1981, Wright began to see Sim lose her train of thought, and in May of 1982 saw Sim's mental capacities diminish further. For example, when Wright and Sim were watching a television evangelist, Sim arose from the davenport and, referring to the television program, announced, "He's going to kill me. He's going to kill me. Help, they're going to put me up as a sacrifice." As another example, Sim would light the electric stove, forget to turn it off, and burn up whatever had been placed thereon. By July of 1982, Sim could hardly recognize where she was going. She would get lost very easily, including in the grocery store. Sim would tell Wright that she was going to a certain place, but would head in the other direction. Sim would say, "I'm going to the bathroom" and then get lost behind the French door in the living room.

Robert S. Comiskey is married to Joan Comiskey and is the son of Opal Comiskey, notwithstanding the fact he testified that Sim was "the only mother I've ever had." Robert and his wife had apparently lived with "Aunt Maude" since 1975. Robert performed simple maintenance around the house, mowed the lawn, and painted; Joan cooked, drove, and occasionally did Sim's laundry. Sometime in June of 1982, Wright suggested that she and her husband, Vance, move in and take over the job of caring for Sim.

Sim fell and injured her hip and elbow on June 25, 1982. She was taken to St. Mary's Hospital in Nebraska City and, in addition to the injuries, was provisionally diagnosed as having organic brain syndrome. The medical reports show that she had been deteriorating mentally. Family members reported that Sim had been having hallucinations but that her prescribed medication, Haldol, had been helping. Sim was finally diagnosed as having parkinsonism, among other things.

Parkinsonism is the condition characteristic of Parkinson's disease, a neurological disorder usually due to arteriosclerotic changes in the basal ganglia of the brain, and marked by muscular tremors, droopy posture, rigidity, and a masklike facial expression. 3 J.E. Schmidt, Attorneys' Dictionary of Medicine and Word Finder P-51 (1987). Sim's discharge summary of July 6, 1982, also reports that she "was confused off and on" and that "[s]ometimes she didn't even remember her sister's name when she was in the room or the doctor's name." Sim was transferred to Clarkson Hospital in Omaha to see a neurologist. The July 6, 1982, discharge summary also shows that "[t]his was requested partly by the family and partly by Mr. [Harvey] Neumeister, a lawyer friend of hers." A computerized axial tomography (CAT) scan revealed the presence of Alzheimer's disease, a form of mental deterioration marked by a wasting of the cortex of the brain and the development of argyrophil plaques. 1 J.E. Schmidt, *supra* at A-159. The discharge summary further states that Sim's "prognosis is poor as far as the Alzheimer's with gradual deterioration. She has organic brain syndrome and needs somebody to keep an eye on her." On July 2, 1982, one of Sim's half sisters discussed with Sim's doctor the possibility of applying for appropriate guardianship. The doctor's notes from July 2, 1982, indicate that the doctor thought that was very reasonable.

When Sim left the hospital and returned home, Opal Comiskey stayed with Sim to care for her needs. Opal Comiskey had the locks changed on or about August 5, 1982, "to keep Joan [Comiskey] from running in and out whenever she chose." According to Opal Comiskey, Harvey A. Neumeister "had charge of" Sim's money already, at this time, and Opal Comiskey would sometimes have to use her own money to buy groceries for Sim.

A few days after Opal Comiskey was no longer able to care for Sim, another friend, Helen Gladys Parks Beccard, who was herself then 89 years old, came to care for her.

Sim was taken to Duff's Nursing Home in Nebraska City on August 10, 1982, by Joan Comiskey, Gladys Beccard, and perhaps Margaret Kreifels. The nursing home was told to send

the bills to Harvey Neumeister. Harvey Neumeister regularly called upon Sim at the nursing home and conferred with the nursing home about the care Sim was receiving and the care she might need. Opal Comiskey was not informed that Sim had been taken to a nursing home and did not know Sim's whereabouts for 2 weeks, when she read about Sim in the nursing home news. In fact, Opal Comiskey was kept from visiting Sim until more than 1 month after she and Wright, on September 3, 1982, petitioned for the appointment of a guardian and conservator for Sim on the basis that because of physical disability and advanced age, Sim could not take care of herself or her assets. Following that filing, on application of the half sisters, the court issued an order certifying that there were no restrictions on visiting Sim.

The county court set a hearing on the petition for September 24, 1982, appointed a provisional guardian ad litem for Sim, and appointed a physician to examine Sim and submit a report to the court. Before the hearing could be held, however, Harvey A. Neumeister and his son, Kent J. Neumeister, appeared as Sim's attorneys and initiated a number of steps which prevented the orderly progress of the proceeding. These steps included the writing of letters, bearing only Harvey Neumeister's signature, advising the guardian ad litem and physician that Sim did not recognize their authority and would not cooperate with them; the bringing of simultaneous actions in both the county and district courts to enjoin the proceeding on the ground the relevant statutes are unconstitutional; and suing the half sisters, judges, sheriffs, attorney for the half sisters, the court-appointed guardian ad litem, and the court-appointed physician.

At no time, however, was an answer filed alleging that Sim was competent, nor did Sim ever appear and testify that there was no need for a guardian or conservator.

The guardian ad litem met with Sim at the nursing home on September 21, 1982. Sim indicated

> that she didn't feel that she was incompetent and that she didn't need or want the two sisters or either of them appointed for her as guardian and conservator, and that Mr. [Harvey] Neumeister had been taking care of her

186

things for her and that she felt that he could continue to do that for her.

The guardian ad litem nonetheless was of the opinion that the interview showed the need for a guardian or a conservator to care for Sim's affairs.

On October 7, 1982, Sim signed a joint tenancy warranty deed which conveyed her home in Nebraska City to Robert and Joan Comiskey in consideration of $1 and love and affection. The $25.85 transfer tax stamp affixed November 5, 1982, suggests, however, that the actual value of the property involved in the transaction was $23,500. The deed also recites that "[t]his deed by gift voids in my Will dated May 13, 1980, Paragraph SECOND #10 . . . ."

Sim executed a second warranty deed on October 7, 1982, which conveyed four pieces of realty in Nebraska City to "Harvey A. Neumeister, Trustee," with additional language, neither typed nor in Sim's handwriting, which states, "if necessary, Kent J. Neumeister as alternate trustee or successor trustee."

Alba B. Neumeister, Harvey Neumeister's wife of over 50 years and stenographer for more than 40 years, testified in response to questioning by her son, Kent Neumeister, using notes he had typed, that she has known Sim for over 40 years and that on October 7, 1982, she picked up Sim from the home, drove her to Lincoln, ate lunch with her before the documents and deeds were executed, and took her shopping after the documents and deeds were executed. Mrs. Neumeister's testimony concerning the signing of the documents shows that the only people present were herself; her husband; William Walker, an attorney now deceased; Sim; and the notary public, Don G. Renner. Mrs. Neumeister also testified that her husband asked Sim whether she understood what she was signing, but did not give any testimony as to Sim's response to that question. Mrs. Neumeister did state that Sim "followed those documents that she signed, that trust agreement and those deeds that she signed — or one deed that she signed, and also the transfer of the car. She could read those. She had her mentality at that time."

Harvey Neumeister later testified that his wife forgot about

the second deed to himself as trustee of three (sic) pieces of property.

Harvey Neumeister testified that he is Sim's lawyer and also acts as her trustee. He drafted the trust instrument which named himself as trustee, and further drafted two instruments which purportedly gave himself power of attorney for Sim. His testimony is that his power of attorney "couldn't be any broader" and that the trust instrument contained no duty for the trustee to account to anyone. These documents were also purportedly executed by Sim on October 7, 1982.

Don G. Renner attested that when he notarized Sim's signatures on the various documents on October 7, 1982, he "did not have any discussion with Mrs. Sim regarding the instruments being executed, did not inquire about them, and cannot testify or affirm whether or not Maude C. Sim knew anything about the documents or was competent to understand them and realize what she was signing . . . ."

Sim remained at the nursing home until August of 1983. On August 29, 1983, Otoe County Judge Eugene Atkinson appointed two Bellevue physicians to examine Sim. Two days after the order was entered, Robert Comiskey removed Sim from the nursing home, and she never returned there. Harvey Neumeister admitted he knew the court entered the order which appointed the two doctors to examine his client. Kent Neumeister, however, took the position that the order was written on August 29, 1983, but not filed until August 31, 1983, and that it was addressed to the doctors but neither to Sim's attorneys nor to Robert and Joan Comiskey. Kent Neumeister thus concluded "that if Judge Atkinson doesn't know how to make out an order, that's not our fault." On October 26, 1983, Harvey Neumeister called Duff's Nursing Home and said that "they were dismissing Maude effective 10-31 and would pick up all of her belongings." Harvey Neumeister later testified that Sim's removal from the nursing home was a decision made by her lawyers that she was not going to be examined by the doctors. His basis for violating the court order was that "this has been an unconstitutional thing."

Sim moved in with Robert Comiskey on August 31, 1983, and fell and broke her hip sometime prior to October 2, 1983,

when she was taken to a hospital in Lincoln, where she remained until around January 8, 1984.

Samuel Hofer, the pastor at the Presbyterian church where Sim had been worshiping for 27 years, visited Sim at Duff's Nursing Home in July or August of 1983. He tried to visit her again at Christmas to present a gift but was told that she had left the nursing home. The clergyman unsuccessfully attempted to locate her at other nursing homes in town. He called Joan Comiskey and was told that he would have to learn Sim's whereabouts from "Mr. Neumeister." The clergyman made 15 or 20 unsuccessful attempts to contact one of the Messrs. Neumeister.

Harvey and Kent Neumeister continued to hide Sim for more than half a year, refusing to disclose her whereabouts to Sim's half sisters, to her pastor, or to the court. On March 22, 1984, Harvey Neumeister finally answered the court's inquiry and revealed that he had moved Sim to Milder Manor in Lincoln.

The court then, through Judge Robert C. McGowan, appointed Dr. Emmett Kenney to examine Sim, and instructed counsel not to interfere with the psychiatric evaluation. The court further stated that "[i]f somebody wants a reporter there to record it, it's all right with me. I don't care. But there are not going to be any attorneys participating in this thing. It's a medical question at this point . . . ."

Dr. Kenney examined Sim for about an hour on April 28, 1984, to see if a mental illness was present that would interfere with Sim's capacity to act in her own best interests. The doctor identified himself to Sim as a court-appointed physician and psychiatrist, and explained to her that this was a special examination and that the result of it would not be confidential because there would be a report to the court. No court reporter was present during the interview.

The doctor testified that he made specific inquiries and that Sim made some specific answers. When asked three times when her birthday was, Sim responded that it's true, that she was going, and "with the girls." When asked where she lived, Sim responded that she lived mainly on the Lincoln trail, and answered that the building she was in was "plastic and ring way." She gave the current date to be April 3, 1886. She evaded a

question as to the cost of a loaf of bread but finally answered 25 cents. She priced a quart of milk at 20 cents. When asked if she had any relatives, Sim responded that she had "half of an umbrella." When asked with whom she was living, she responded, "Rolled oats high cut."

The doctor's opinion was that Sim had an organic brain syndrome which adversely affected her judgment, orientation, memory, affect, and cognition. The doctor stated that while Alzheimer's would cause an organic brain disease, he doubted that the previous diagnosis of Alzheimer's was correct. His own opinion was that Sim suffered from an organic brain disease that affected her judgment, memory, and cognition, and that her mental condition left her "vulnerable to exploitation."

Robert Comiskey, called on Sim's behalf, was asked at the June 14, 1984, hearing, "I want to know if you feel [Sim] can handle her affairs today." His answer was, "Today? Right now, at this moment, quite honestly, no." Even Harvey Neumeister, at the same hearing, when asked, "Do you think today, Mr. Neumeister, that Maude can handle her own affairs?" answered, "I think she needs help."

### III. JUDGMENTS APPEALED
#### 1. Case No. 85-422

The county court found it was necessary to appoint a guardian and conservator for Sim and designated Wood as such, directing that, until further order, his authority as guardian be limited to monitoring Sim's condition at Milder Manor in Lincoln, reporting Sim's condition quarterly to the court, setting aside any restrictions on rights of visitation with her, and waiving on Sim's behalf any statutory or other privileges as to confidential communications. Wood's authority as conservator was, pending further order, limited to obtaining a copy of the power of attorney and trust agreement, and procuring an accounting, pursuant to Neb. Rev. Stat. ch. 30, art. 28 (Reissue 1985), of all assets Harvey Neumeister claims to hold as trustee for Sim and of all receipts and expenditures as trustee.

Sim's attorneys promptly appealed the county court's order to the district court, which affirmed but modified the county court judgment by removing all limitations on the authority of

the guardian and conservator. Sim's attorneys have appealed the district court's judgment to this court.

2. Case No. 85-922

Since Sim's attorneys had appealed the county court's judgment in case No. 85-422 to the district court before the county court had the opportunity to issue letters of appointment to Wood, the county court, concluding it had lost jurisdiction, denied Wood's application for such letters. Wood then, in the district court appeal taken by Sim's attorneys and which constitutes the subject matter of case No. 85-422, applied for such letters from the district court. The district court denied the application on the ground that since Wood had not appealed from the county court's refusal to issue the letters, the district court lacked jurisdiction. Wood has appealed that district court judgment to this court.

IV. ANALYSIS OF CASE NO. 85-422

We concern ourselves first with case No. 85-422, in connection with which Sim's attorneys assign 12 errors. We begin by noting that, like the district court, our scope of review is for error appearing on the record made in the county court. *In re Estate of Oltmer*, 214 Neb. 830, 336 N.W.2d 560 (1983); Neb. Rev. Stat. § 24-541.06 (Reissue 1985). See, also, *In re Estate of Michels*, 223 Neb. 286, 389 N.W.2d 285 (1986); *In re Estate of Wagner*, 222 Neb. 699, 386 N.W.2d 448 (1986); *In re Estate of Wagner*, 220 Neb. 32, 367 N.W.2d 736 (1985).

1. Need for Guardianship and Conservatorship

The first assignment claims that the courts below erred in failing to hold that "the guardianship law is unconstitutional as applied to the constitutionally protected conduct of Mrs. Sim because she has already fulfilled the only permissible purpose for guardianship by moving into a nursing home and establishing a durable power of attorney and an irrevocable trust with herself as the lifetime beneficiary."

In this connection Sim's attorneys argue in general terms that Sim is a person who has a right to liberty, property, association, travel, privacy, a good reputation, and to due process and the equal protection of the laws. The question, however, is not whether Sim possesses those rights but whether the State of Nebraska has a legitimate interest in protecting Sim's person

and property and whether it has asserted that interest in a constitutionally permissible manner.

In beginning the analysis of this assignment, it is appropriate to recall that attached to every constitutional challenge is the presumption that acts of the Nebraska Unicameral are constitutional, with all reasonable doubts resolved in favor of constitutionality. *State ex rel. Wright v. Pepperl*, 221 Neb. 664, 380 N.W.2d 259 (1986); *State v. Mayhew Products Corp.*, 211 Neb. 300, 318 N.W.2d 280 (1982). This presumption continues until the statute under review clearly appears to contravene some constitutional provision. *Lenstrom v. Thone*, 209 Neb. 783, 311 N.W.2d 884 (1981); *Prendergast v. Nelson*, 199 Neb. 97, 256 N.W.2d 657 (1977). Because statutes are presumed to be constitutional, the burden of establishing the unconstitutionality of a statute is on the one attacking its validity. *State v. Mayhew Products Corp., supra.*

The relevant statutes embody separate systems of guardianship to protect persons of minors and mental incompetents, and also include provisions for a type of power of attorney that does not terminate on disability of the principal, which adults may use when approaching senility or incompetence to obviate the need for other kinds of protective regimes. Neb. Rev. Stat. ch. 30, art. 26 general comment (Reissue 1985).

In presenting their position Sim's attorneys place heavy reliance on *Matter of Forward*, 86 A.D.2d 850, 447 N.Y.S.2d 286 (1982), a proceeding to appoint a conservator under the New York mental hygiene law. Therein, the proposed conservatee, an 88-year-old woman who resided with her family, had "recently executed an irrevocable trust" with a bank and trust company as trustee and herself as the lifetime beneficiary, to provide for her medical and living expenses. *Id.* at 851, 447 N.Y.S.2d at 287. The court noted that even if the woman's ability to care for her property were found to be substantially impaired, as the distributees had alleged, the trust would continue in force and the care of her property would be assured for the duration of her life. The court concluded that under the circumstances of that case there was no need to appoint a conservator, and there were no triable issues of fact

which would alter the result. There are, however, a number of features which distinguish the present case from *Forward*. First, since the *Forward* court was able to describe the trust provisions, we must conclude that the court had the trust before it. In the present case we have before us only the drafter's representations concerning the existence of certain selected terms of the trust. Second, the absence of other triable issues of fact signals that there were in *Forward* no concerns that the settlor lacked capacity or made her own decisions. Third, as the county court in the present case noted, "The trustee in Forward was a trust company and the very brief opinion does not touch upon the subject of accounting. Apparently accounting was not a problem in Forward." Fourth, the *Forward* decision does not disclose whether the trust was executed before or after the conservatorship proceedings had been commenced.

Sim's attorneys also cite *Matter of Waxman*, 96 A.D.2d 906, 466 N.Y.S.2d 85 (1983), wherein an application to appoint a conservator was dismissed because, among other things, the appellant had "recently executed an irrevocable trust," with his attorney as trustee and himself as lifetime beneficiary for the purpose of providing for his lifetime medical and living expenses. *Id.* at 907, 466 N.Y.S.2d at 87. The *Waxman* court, however, remanded the proposed conservatee's counterclaim, which included issues of fraud, duress, and the unlawful withholding of property by his wife and her attorneys. Sim's attorneys failed to call our attention to the result on appeal after remand of that case. In *Matter of Waxman*, 110 A.D.2d 644, 487 N.Y.S.2d 381 (1985), the same court noted that the previous decision did not reach the validity of the inter vivos trust, and again remanded the case for hearing because of conflicting evidence as to Waxman's state of mind at the time of the trust's execution and as to whether Waxman had received a proper explanation of the trust, including a clause which waived the settlor's statutory rights to revoke the trust.

Sim's attorneys do not relate the dispersive constitutional attack they make under this assignment of error to any particular statutory provision employed in this proceeding; rather, they seem to assault the application of the entire guardianship and conservatorship statutory schemes to Sim on

vaguely articulated grounds that the schemes violate portions of the federal Bill of Rights. Nothing has been called to our attention, nor do we find anything, which supports such an attack to the application of the pertinent portions of the statutory schemes to Sim. Accordingly, this assignment of error fails.

## 2. Certainty and Breadth of Standards

The second assignment of error declares the courts below erred in failing to declare that the various standards contained in "the guardianship law are overbroad and vague and fail to incorporate the least restrictive alternative as applied to the constitutionally protected conduct of Mrs. Sim."

To the extent pertinent to our inquiry, § 30-2619 provides:

(a) The allegedly incapacitated person or any person interested in his or her welfare may petition for a finding of incapacity and appointment of a guardian. The petition shall be verified and shall contain allegations with regard to any of the areas as provided under section 30-2619.01 in which the petitioner claims that the allegedly incapacitated person lacks sufficient understanding to make or communicate responsible decisions concerning his or her own person.

The "areas" contained in § 30-2619.01, to which § 30-2619 refers, concern the

allegedly incapacitated person's ability to make, communicate, or carry out responsible decisions concerning his or her person with regard to:

(1) Selecting his or her place of abode within or without this state;

(2) Arranging for his or her medical care;

(3) Protecting his or her personal effects;

(4) Giving necessary consents, approvals, or releases;

(5) Arranging for training, education, or other habilitating services appropriate to him or her;

(6) Applying for private or governmental benefits to which he or she may be entitled;

(7) Instituting proceedings to compel any person liable for the support of the proposed ward to support him or her if no conservator has been appointed for the proposed

ward;

(8) Entering into contractual agreements if no conservator has been appointed for the proposed ward;

(9) Receiving money and tangible property deliverable to him or her and applying such money and property to his or her expenses for room and board, medical care, personal effects, training, education, and habilitative services; and

(10) Any other area of inquiry which the court may direct.

The relevant portions of § 30-2630 provide:

Upon petition and after notice and hearing in accordance with the provisions of this part, the court may appoint a conservator or make other protective order for cause as follows:

. . . .

(2) Appointment of a conservator or other protective order may be made in relation to the estate and property affairs of a person if the court determines that (i) the person is unable to manage his or her property and property affairs effectively for reasons such as mental illness, mental deficiency, physical illness or disability, advanced age, . . . or disappearance; and (ii) the person has property which will be wasted or dissipated unless proper management is provided . . . .

While we have held that one may not have his or her property taken away and placed in the hands of a conservator merely because potential heirs believe there will be more left for them if the owner is not free to deal with the property as he or she chooses, *In re Estate of Wagner*, 220 Neb. 32, 367 N.W.2d 736 (1985), it is clear that a conservator may be appointed for one who, because of advanced age, is unable to manage and will therefore waste or dissipate his or her property unless proper management is provided. *In re Estate of Oltmer*, 214 Neb. 830, 336 N.W.2d 560 (1983).

In reliance upon *O'Connor v. Donaldson*, 422 U.S. 563, 576, 95 S. Ct. 2486, 45 L. Ed. 2d 396 (1975), Sim's attorneys first argue that a state "cannot constitutionally confine without more a nondangerous individual who is capable of surviving

safely in freedom by himself or with the help of willing and responsible family members or friends." The present case does not, however, deal with the commitment with which *O'Connor* concerned itself and which the U.S. Supreme Court termed a "massive curtailment of liberty." *Humphrey v. Cady*, 405 U.S. 504, 509, 92 S. Ct. 1048, 31 L. Ed. 2d 394 (1972).

Sim's attorneys have presented no legal authority which requires the use of a "least restrictive alternative" in a guardianship and conservatorship proceeding such as is at issue in the present case. Indeed, the U.S. Supreme Court imposed no such requirement even when dealing with the substantive rights of involuntarily committed mentally retarded individuals under the 14th amendment to the U.S. Constitution. In *Youngberg v. Romeo*, 457 U.S. 307, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982), the U.S. Supreme Court concluded that an involuntarily committed mentally retarded person's liberty interests required only that, in addition to food, shelter, clothing, and medical care, the state provide minimally adequate or reasonable training to ensure safety and freedom from undue restraint, and recognized that in determining what is "reasonable," the courts "must show deference to the judgment exercised by a qualified professional." *Id*. at 322. An application of the *Youngberg* principles is found in *Mental Health Ass'n v. Deukmejian*, 186 Cal. App. 3d 1531, 233 Cal. Rptr. 130 (1986), *modified* 187 Cal. App. 3d 212A, 233 Cal. Rptr. 130, *review denied and ordered not to be officially published* (Cal. Mar. 5, 1987).

Sim's attorneys further contend that the conservatorship statute is vague and overly broad. In arguing that the "necessary or desirable" standard of § 30-2630(2)(ii) and the phrase "the person is unable to manage his or her property and property affairs effectively" in § 30-2630(2)(i) are overbroad, they rely on *In re Boyer*, 636 P.2d 1085 (Utah 1981). In doing so, they characterize *Boyer* as a case where the Supreme Court of Utah "reviewed the constituionality [sic] of the Utah guardianship law which contains standards identical to the guardianship law in Nebraska." Brief for Appellant Sim at 31. What Sim's attorneys fail to state is that in its constitutional review, the *Boyer* court (1) found that while the phrase

"responsible decisions" admitted of a broad interpretation, it was *not unconstitutionally vague* because it was limited to situations wherein the putative ward's decisionmaking process was so impaired that he or she would be unable to care for his or her personal safety or unable to attend to and provide for such necessities as food, shelter, clothing, and necessary medical care; (2) there was no "least restrictive alternative" requirement in a guardianship proceeding; (3) the guardianship statute *was not unconstitutionally overbroad*; (4) the flexibility available to a judge in tailoring a specific remedy to a specific individual lessens the potential for an overly broad deprivation of personal decisionmaking power; and (5) evidence of incompetency must be established by clear and convincing evidence. While it is true the *Boyer* court reversed the appointment of a guardian, it did so not because of a constitutional infirmity but because there was no clear and convincing evidence of incompetency.

There is no merit to this assignment of error.

### 3. Prepetition Decisions

The third assignment of error asserts that the lower courts erred in failing to interpret "the guardianship law in a way that is consistent with the only constitutional purpose for guardianship so that Mrs. Sim is not 'incapacitated' when she has already made 'responsible decisions' concerning her own person and property."

The key flaw in this assignment is the word "already," because although the record shows that Sim had entered a nursing home before the petition was filed, there had been no decisions "already made" concerning her property. Moreover, the record does not disclose that Sim herself made the decision to enter a nursing home. Another flaw is found in the use of the word "responsible," which refers not only to the method used in the decisionmaking process but to the quality of those decisions as well. The conveyances, trust, and powers of attorney were signed after the subject proceeding was initiated, under circumstances which leave us in doubt as to Sim's level of understanding of the nature and finality of her acts.

The constitutional arguments Sim's attorneys make in connection with this assignment of error have been addressed in the analysis of the first two assignments. As with those

preceding assignments, this third claim is also without merit.

### 4. Sufficiency of the Evidence

In their fourth assignment Sim's attorneys state the lower courts erred in failing "to hold that, given a proper interpretation of the guardianship law, the determination that imposed guardianship and conservatorship on Mrs. Sim is contrary to the evidence in the case."

This court has long recognized that each case of this type must be determined upon its particular facts. *Hyde v. Crocker*, 185 Neb. 428, 176 N.W.2d 234 (1970); *Cass v. Pense*, 155 Neb. 792, 54 N.W.2d 68 (1952). In each case the question is whether the record is such as to establish that the statutory grounds exist to appoint a guardian or conservator.

The record outlined in part II of this opinion clearly and convincingly shows that at the relevant time, that is, at the time of the appointment of the guardian and conservator, *Hyde v. Crocker, supra*, Sim was, because of advanced age, suffering from a mental deficiency such as to render her unable to care for herself or to manage her assets. She is therefore an "incapacitated person" within the contemplation of § 30-2619. The record also clearly and convincingly establishes that Sim is incapable of demanding an accounting and is unable to understand any accounting her trustee might provide her. She is therefore, as more fully discussed in section 12 hereinafter, a person having property and property affairs which she cannot manage, thereby rendering her property vulnerable to waste and dissipation. Sim is therefore also within the contemplation of § 30-2630. Accordingly, there is no merit to this assignment of error.

### 5. Evidentiary Rulings

Sim's attorneys in the next, and fifth, assignment pronounce that the courts below erred in "overruling Mrs. Sim's defense against guardianship because they erroneously held that her properly admitted evidence had not been admitted into evidence."

We understand the argument in this connection to be that the county court erred in refusing to consider as having received in evidence certain of Harvey Neumeister's affidavits. It is true that in its judgment the county court observed that affidavits

filed with the clerk but not received in evidence were not evidence. However, the county court judgment does not state that any particular affidavits had not been received. The record in fact reveals that a number of Harvey Neumeister's affidavits offered by the half sisters were received in evidence without objection and that those affidavits include Harvey Neumeister's representations that Sim had made the conveyances, had created the trust, and had granted him the powers of attorney as discussed earlier, in part II of this opinion. Those representations constitute the gravamen of the attorneys' defense to the appointment of a guardian and conservator. Thus, there is no substance to the claim that the "defense against guardianship" was prejudiced by the county court's holding that Sim's "properly admitted evidence had not been admitted into evidence." The attorneys' real complaint seems to be that the county court did not decide the case as they wanted it decided. That is a matter for this court to review and resolve, but there is no merit to this particular assignment.

## 6. Adequacy of Petition

In the sixth assignment of error Sim's attorneys contend that the courts below "erred in failing to hold that the guardianship law is unconstitutional because it allows orders to be issued against Mrs. Sim on the basis of a constitutionally defective petition for guardianship."

To the extent the argument in connection with this assignment differs from that presented in the next one, it is that a petition which is phrased in statutory terms is somehow constitutionally defective. Sim's attorneys cite no relevant authority in support of that position, and we find none. We note, however, that even in criminal cases, a complaint charging a crime in the words of the relevant statute is deemed sufficient. *State v. Wehrle*, 223 Neb. 928, 395 N.W.2d 142 (1986). Surely, then, a petition such as involved in this case, which is in the words of the relevant statute, is adequate in the absence of a motion for a more definite statement. The fact a party may be entitled to require a more definite statement from a petitioner does not necessarily mean that the statement as originally made was not sufficient to state a cause of action. See *Willis v. Rose*, 223 Neb. 49, 388 N.W.2d 101 (1986). The record in this case

contains no motion for a more definite statement; under such circumstances, any right Sim's attorneys may have had for such was waived. *Lease Northwest v. Davis*, 224 Neb. 617, 400 N.W.2d 220 (1987). This assignment has no merit.

### 7. No Probable Cause Hearing

In their seventh assignment Sim's attorneys proclaim that there was error "in failing to hold that the guardianship law is unconstitutional because Mrs. Sim was denied the right to have a probable cause hearing after being served with the petition for guardianship."

The essence of the argument in this connection is that the guardianship and conservatorship statutes are flawed, in that they make no provision for a preliminary determination that the allegations of the petition are probably true before permitting an order for medical and psychiatric examinations. In the context of this case, however, the assignment presents a nonissue because Sim's attorneys prevented any examination for many months, and the examination, when finally conducted, established that the allegations of the petition as related to Sim's condition were correct. Under the circumstances, no further discussion is required to demonstrate that the subject assignment is without merit.

### 8. Conduct of Psychiatric Examination

In the eighth assignment Sim's attorneys aver that Sim was erroneously "deprived of her constitutional right to have the assistance of legal counsel before, during, and after her interrogation by the psychiatrist."

It is to be noted in the first instance that, as reflected in part II of this opinion, the county court only required that the attorneys not interfere with the psychiatric examination; no order prevented the attorneys from consulting with Sim either before or after the examination.

In essence, Sim's attorneys claim that her sixth amendment right to counsel was violated by their inability to be present during the course of the examination.

The difficulty with that position is that it is not supported by either legal authority or sound reasoning. It is true that the cases cited by Sim's attorneys, *Vitek v. Jones*, 445 U.S. 480, 100 S. Ct. 1254, 63 L. Ed. 2d 552 (1980); *Doe v. Gallinot*, 657 F.2d

1017 (9th Cir. 1981); *Luna v. Van Zandt*, 554 F. Supp. 68 (S.D. Tex. 1982); *Lynch v. Baxley*, 386 F. Supp. 378 (M.D. Ala. 1974), *reversed* 651 F.2d 387 (5th Cir. 1981); and *Lessard v. Schmidt*, 349 F. Supp. 1078 (E.D. Wis. 1972), *judgment vacated* 414 U.S. 473, 94 S. Ct. 713, 38 L. Ed. 2d 661 (1974), *again vacated* 421 U.S. 957, 95 S. Ct. 1943, 44 L. Ed. 2d 445 (1975), hold that the subject of an involuntary civil commitment proceeding for mental illness, or one being transferred from prison to a mental hospital, is entitled to a due process hearing. None of those cases hold, however, that there exists a right to the presence of counsel during the course of a psychiatric examination. Indeed, *Lynch v. Baxley, supra*, requires only that the names of witnesses, including any examining physicians, be made available to counsel prior to any hearing and that counsel be permitted to inspect any documents or records pertaining to the case. In an analogous matter, the termination of parental rights, this court approved the receipt of evidence which was developed through interviewing the parents outside counsel's presence. *In re Interest of Spradlin*, 214 Neb. 834, 336 N.W.2d 563 (1983), *cert. denied* 464 U.S. 1011, 104 S. Ct. 533, 78 L. Ed. 2d 714.

For the reasons above stated we conclude there is no merit to this assignment of error.

### 9. Nonrecording of Psychiatric Examination

In this assignment Sim's attorneys urge that Sim was erroneously deprived of her right "to have an official transcript of her interrogation by the psychiatrist after the county court had declared her right, she was denied legal counsel, and she volunteered to pay for the transcript."

It must first be observed that in asserting the county court declared Sim had a right to a transcript of the court-ordered psychiatric examination, Sim's attorneys misrepresent the record. The county court did not declare any "right" to have the examination recorded or that he, the judge, wanted it recorded. The county court gratuitously offered Sim's attorneys an opportunity to have a reporter present if they wished. They told the court they would think it over for a while. Sim's attorneys later sent a letter to the judge to accept the offer. The court then wrote a letter to Dr. Kenney, which stated:

"Please let me know when you plan to go [conduct your examination] and I will call the reporting service and make arrangements for the reporter to meet you at the nursing home."

Dr. Kenney testified that he has performed over 300 of these examinations for the courts and for the Veterans Administration, and never before had there been a court reporter present. Although the court contacted Dr. Kenney before he conducted the examination, he failed to have a reporter present.

Sim's attorneys argue that the absence of a verbatim transcript prejudices Sim's rights in a way that could not be remedied at trial. The fact of the matter, however, is that Sim's attorneys did not even try to refute Dr. Kenney's evidence. They could have arranged their own examination to dispute Sim's mental condition, or simply brought Sim into court to testify that she did not need a guardian or conservator. Sim's attorneys are unable to point to any prejudice that could not be remedied at trial. They had an opportunity to thoroughly cross-examine Dr. Kenney as to all of the events which occurred at his examination and about all of Sim's responses. The results of the examination are uncontroverted. Because of these factors, and because among the more than 45 pounds of paper comprising the record there is not a single answer denying Sim's incompetency, the failure to record the psychiatric evaluation must be viewed as harmless. Error without prejudice is not a ground for reversal. *Hennis v. O'Connor*, 223 Neb. 112, 388 N.W.2d 470 (1986); *Emery v. Mangiameli*, 218 Neb. 740, 359 N.W.2d 83 (1984).

### 10. Nature of Psychiatric Examination

In their 10th assignment Sim's attorneys allege that the courts below erred "in failing to hold that Mrs. Sim was deprived of her right to be warned that the confidential relationship she has with her regular doctor no longer applies when she is being examined by a court-appointed doctor, and that her statements can be used against her."

This assignment can be resolved quickly, for the characterization of the record by Sim's attorneys is not entirely accurate. While it is true that Dr. Kenney did not say to Sim in so

many words that the statements she made could be used "against her," he did tell Sim, as stated earlier, in part II, that the examination was not confidential because there would be a report to the court. To suggest that such advice is not enough to inform one mentally capable of understanding that no confidential relationship exists and that what she said would be used in the proceeding is ludicrous.

### 11. No Right to Remain Silent

In this 11th assignment Sim's attorneys postulate there was error "in failing to hold that Mrs. Sim was deprived of her right to remain silent during the interrogation by the psychiatrist so that she is not compelled to be a witness against herself."

The argument made in support of this proposition rests principally upon *Estelle v. Smith*, 451 U.S. 454, 101 S. Ct. 1866, 68 L. Ed. 2d 359 (1981), wherein the U.S. Supreme Court held that a court-ordered psychiatric examination to determine a criminal defendant's competency to stand trial, at which he was not warned he had a right to remain silent, could not be used in determining what penalty should be imposed. The *Estelle* Court ruled that the use of the examination, under the circumstances of that case, violated both the defendant's fifth amendment privilege against self-incrimination and his sixth amendment right to counsel, and thus overturned the imposition of the death penalty. The obvious and fundamental distinction between *Estelle* and the matter before us is that the present case is not a criminal one. In *Kraemer v. Mental Health Board of the State of Nebraska*, 199 Neb. 784, 261 N.W.2d 626 (1978), *cert. denied* 441 U.S. 960, 99 S. Ct. 2403, 60 L. Ed. 2d 1064 (1979), this court examined Neb. Rev. Stat. § 83-1059 (Reissue 1976), which prescribes the rules of evidence applicable to proceedings under the Nebraska Mental Health Commitment Act. In holding that *Miranda* warnings need not be given, the court stated: "In this case Kraemer was not charged with a crime, or even suspected of a crime. He was not being interrogated by a law enforcement officer, but by a doctor and the purpose was to determine, by medical diagnosis, his mental status." 199 Neb. at 795, 261 N.W.2d at 632. We have further held that where medical testing is required by law, there is no requirement in Nebraska that *Miranda* warnings be given.

There is therefore no merit to the effort of Sim's attorneys to impose the requirement that *Miranda* warnings be given prior to a psychiatric examination in guardianship and conservatorship cases. We have held that the *Miranda* rule applies to custodial interrogations by law enforcement officers of persons suspected of or charged with crime. See *State v. Bishop*, 224 Neb. 522, 399 N.W.2d 271 (1987), which holds that there is no requirement that *Miranda* warnings be given prior to requesting a driver to submit to a chemical test of blood, breath, or urine. We have also held that absent questions which would subject a parent to criminal sanctions, a proceeding to terminate parental rights does not trigger the protection afforded by the fifth amendment against self-incrimination. *In re Interest of M.S.*, 218 Neb. 889, 360 N.W.2d 478 (1984), *cert. denied* 471 U.S. 1138, 105 S. Ct. 2680, 86 L. Ed. 2d 698 (1985).

12. Scope of Duties of Guardian and Conservator

In this 12th, and last, assignment, Sim's attorneys conclude that the "district court erred in granting the guardian and conservator unlimited power over Mrs. Sim and her property in violation of the requirement of the least restrictive alternative."

The question is not whether the district court violated any nonexistent "least restrictive alternative" requirement but whether there was any "error appearing on the record made in the county court" which the district court was authorized to correct.

When all is said and done, the overriding issue in this case is whether the record supports the county court's conclusion that a guardian is needed to oversee the care given Sim and to see to it that she is not denied access to visitors, and that a conservator is required to determine what has happened to her assets.

Prior to the designation of a guardian, Sim's attorneys secreted her and restricted her access to visitors. Since the purpose to be served by the guardianship is to see to it that Sim continues to receive appropriate care and is not hidden from her family, the restrictions imposed upon the designated guardian are appropriate.

In essence, the question in connection with the conservatorship is whether the trustee can be made to account. Harvey Neumeister, in his dual role as one of Sim's attorneys

and as her trustee, argues he cannot be so required because the trust instrument provides that he need not account to anyone, presumably not even to Sim as the settlor. Such a position is untenable. Any notion of a trust without accountability is a contradiction in terms. If the trustee cannot be called upon to account, the settlor cannot force the trustee to any particular line of conduct with regard to the trust property, or sue for breach of trust. No trust instrument can relieve a trustee from a duty to account to interested persons. *In re Estate of Wallich*, 18 Utah 2d 240, 420 P.2d 40 (1966); *Wood et al. v. Honeyman et al.*, 178 Or. 484, 169 P.2d 131 (1946). See, also, *Fleener v. Omaha Nat. Co.*, 131 Neb. 253, 267 N.W. 462 (1936); Annot., 171 A.L.R. 631 (1947). Since Sim is in no position to demand or understand an accounting, it is legally right and proper that a conservator make that demand for her. For the present, then, it is appropriate that the conservator's authority be limited as the county court directed. What further authority the conservator may need, if any, will depend upon the outcome of the accounting.

Thus, while our perspective with respect to this assignment is different than that of Sim's attorneys, we nonetheless agree that there was no error on the record made in the county court; accordingly, the district court erred in modifying the county court's judgment.

## V. DISPOSITION OF CASE NO. 85-422

For the reasons hereinabove stated, we affirm but modify the district court's judgment by directing that court to affirm the county court's judgment and to remand the cause to the county court with the direction that the county court issue Wood letters of appointment consistent with its judgment.

## VI. RESOLUTION OF CASE NO. 85-922

The foregoing disposition of case No. 85-422 renders case No. 85-922 moot. Accordingly, case No. 85-922 is dismissed.

## VII. MOTION RE DISQUALIFICATION OF CERTAIN ATTORNEYS

There remains for disposition the motion filed by the Attorney General, who entered the case under the provisions of Neb. Ct. R. of Prac. 16A (rev. 1986) because of the constitutional questions raised, to disqualify both Harvey

Neumeister and Kent Neumeister as attorneys for Sim. The half sisters and Wood joined in the motion, which is grounded on the claim that Canon 5, DR 5-101 and 5-102, of the Code of Professional Responsibility, prohibits members of our bar from at one and the same time acting as attorneys and testifying about substantive matters. While we do not wish to be understood as condoning any violation of our Code of Professional Responsibility, because the record supports the appointment of a guardian and conservator with or without the Neumeisters' participation as witnesses, we overrule the motion without prejudice to such disciplinary sanctions as may prove to be appropriate, if any, because of this and other questionable conduct in which each of Sim's attorneys may have participated.

JUDGMENT IN NO. 85-422 AFFIRMED AS MODIFIED.
APPEAL IN NO. 85-922 DISMISSED.