STATE OF NEBRASKA EX REL. NEBRASKA STATE BAR ASSOCIATION,
RELATOR, V. HARVEY A. NEUMEISTER, RESPONDENT.

449 N.W.2d 17

Filed December 15, 1989.    No. 88-765.

Alison L. Larson, Assistant Counsel for Discipline, for relator.

Vard R. Johnson and Kent J. Neumeister for respondent.

BOSLAUGH, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ., and BLUE and MERRITT, D. JJ.

PER CURIAM.

This is an original disciplinary proceeding brought by the State of Nebraska ex rel. Nebraska State Bar Association against Harvey A. Neumeister, respondent, an attorney and member of the association. On January 5, 1988, respondent was formally charged with violating his oath of office under Neb. Rev. Stat. § 7-104 (Reissue 1987) and Canon 1, DR 1-102(A), and Canon 5, DR 5-101(B) and DR 5-102(A), of the Code of Professional Responsibility.

The charges allege generally that respondent violated the advocate-witness rule and particularly that respondent testified about substantive matters and submitted personal affidavits pertaining to substantive issues during his representation in an extensively litigated guardianship case. That case was disposed of by an opinion of the Supreme Court in *In re Guardianship and Conservatorship of Sim*, 225 Neb. 181, 403 N.W.2d 721

(1987).

A referee was appointed and a disciplinary hearing was held beginning January 24, 1989. The referee filed her 17-page report on April 12, 1989. The referee found respondent in violation of DR 5-101(B) and DR 5-102(A), and recommended that respondent be given a public reprimand and be suspended from the practice of law for 2 months. The relator filed exceptions to the referee's report, accepting the referee's findings of fact but alleging that the suspension was too lenient under the circumstances of the case.

Respondent first filed a 56-page document setting out 74 exceptions to the report (two of which are identified as No. 60). This document has attached 106 pages of exhibits, consisting primarily of respondent's 80-page brief filed with the referee. Respondent later filed "supplemental" exceptions Nos. 74 to 77 (11 pages) and a 9-page motion with an attached exhibit of 43 pages. On September 5, 1989, respondent filed exception No. 78, consisting of 28 pages with 11 pages of exhibits.

We set out the foregoing only to show the incredibly convoluted approach that respondent and his attorneys have taken. The practical result, of course, is that respondent has submitted more than 260 pages of briefing information to this court, in addition to his 50-page brief allowed by the rules of this court. The net result of respondent's activities in this case is that the record presented to this court to review respondent's conduct has grown from the "more than 45 pounds of paper" in the underlying case, *In re Guardianship and Conservatorship of Sim, supra* at 201, 403 N.W.2d at 735, to more than 83 pounds of paper.

We will not set out, again, the underlying facts, but refer to the underlying *Sim* case for a statement of the facts. Further, we will not dispose of, individually, respondent's exceptions to the referee's report. Many of the stated exceptions have absolutely no relevance to the questions presented, and most of them shed no light on the ultimate determination we must make. All of respondent's submissions were read, and those worthy of consideration were given weight in our decision.

The scope of our review is clear. "In a disciplinary proceeding, the determination by the Supreme Court as to

whether discipline should be imposed and what discipline is appropriate is made upon a de novo review of the record." *State ex rel. NSBA v. Cohen*, 231 Neb. 405, 408, 436 N.W.2d 202, 205 (1989). The relator must establish the charges by clear and convincing evidence. *State ex rel. NSBA v. Roubicek*, 225 Neb. 509, 406 N.W.2d 644 (1987).

The canon involved is Canon 5 of the Code of Professional Responsibility, which requires a lawyer to exercise his or her independent professional judgment and to withdraw as counsel when he or she becomes a witness in the case.

> A lawyer shall not accept employment in contemplated or pending litigation if he knows or it is obvious that he or a lawyer in his firm ought to be called as a witness, except he may undertake the employment and he or a lawyer in his firm may testify:
>
> (1) If the testimony will relate solely to an uncontested matter.
>
> (2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.
>
> (3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client.
>
> (4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case.

DR 5-101(B).

> If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5-101(B) (1) through (4).

DR 5-102(A).

Our review of the record shows that the respondent is an 85-year-old resident of Nebraska City, Nebraska, and has been

a practicing attorney there since 1935. For approximately 30 years, the respondent performed a variety of services for a longtime client and friend, Maude Clevenger Sim. In August 1982, Sim, who was elderly and widowed, was placed in a nursing home. The bills for her care were forwarded to respondent, who handled her affairs under a power of attorney Sim had executed in June 1982.

Sim's relatives filed a petition in county court on September 3, 1982, seeking the appointment of a guardian and conservator over Sim. The respondent entered an appearance on Sim's behalf, and on September 17, 1982, he filed an answer stating Sim's objections to the petition. Thereafter, on October 7, 1982, the respondent assisted Sim in the preparation and execution of various documents including a durable power of attorney in favor of the respondent, a deed to the respondent as trustee of her real estate, and an irrevocable trust, Sim being sole lifetime beneficiary and the respondent, her trustee. Prior to this time, respondent, in 1980, had drawn a will for Sim in which he was a beneficiary of a $5,000 bequest.

A pretrial conference was held in the case on November 12, 1982. Although the pretrial order did not show that the respondent would be a witness at trial, a document entitled "Objector's Memorandum for Pre-Trial Conference" listed the respondent as one of 19 potential witnesses for trial. The memorandum was signed by William Walker, Kent Neumeister, and the respondent, all attorneys for Sim, and was filed with the county court.

At a hearing on December 27, 1982, Sim's attorneys defended against guardianship on the theory that if Sim was now incapacitated and could not effectively manage her estate, her execution of the durable power of attorney and irrevocable trust on October 7, 1982, obviated the need for an appointment of a guardian and conservator because her personal and business affairs were now entrusted to the respondent. Although Sim's attorneys posited this defense, Sim never testified and her attorneys refused to disclose copies of the documents she executed on October 7. Instead, they offered into evidence two affidavits prepared by the respondent. The first affidavit was dated November 3, 1982, and recited selected

provisions of the irrevocable trust agreement. The other affidavit was dated November 20, 1982, and recited the circumstances surrounding Sim's execution of the documents on October 7, 1982, and also recited certain facts concerning Sim's business and financial affairs.

In May 1983, petitioners in the county court case filed a motion for a trial on the issue of Sim's competency and attached to that motion respondent's affidavits prepared on November 3 and 20, 1982. Sim's opposition to the motion and constitutional attack thereon resulted in voluminous litigation generated in the court system over the next 10 months. See *In re Guardianship and Conservatorship of Sim*, 225 Neb. 181, 403 N.W.2d 721 (1987), and other *Sim* cases cited therein.

During the course of the litigation, the respondent prepared and offered additional affidavits to the court. In August 1983, the respondent prepared an affidavit to supplement his two affidavits dated November 1982. The three were then offered by Sim's attorneys and received in evidence at a hearing held on September 22 and November 4, 1983. The respondent prepared two more affidavits in March 1984. In his affidavit dated March 9, 1984, the respondent recited in detail his association with Sim and a brief summary of her upbringing and personal character, as well as certain medical attention provided her. The March 9 affidavit also recited the purposes of the trust which respondent contended made the appointment of a guardian or conservator unnecessary.

Finally, a trial on the merits of the case was held March 22, 1984, and the sole issue litigated was whether Sim was competent at the time the petition for guardianship was filed. Sim was not present at trial but was represented by Kent Neumeister, Walker, and the respondent.

At the March 22, 1984, trial, all of the affidavits except for the one dated March 9 were offered by the petitioners and received into evidence. The respondent was also called as a witness by the petitioners' counsel, Robert Hoch. The court questioned the respondent about whether there was a relationship between the filing of the petition for guardianship on September 3, 1982, and Sim's execution of the documents on October 7, 1982, as follows:

[Q.] Just a coincidence?

[A.] No, I don't think just exactly that is true.

She was very fearful, and has been for quite a while, of some of her own people that are sitting in the courtroom — would try to do something to her. That's exactly why she has been more or less of the opinion, and it is her opinion, to stay away from them and not talk to them.

So we hesitated on these things.

Her will is going to take care of all of that anyhow, so we hesitated.

Finally, we thought to clear this thing up, like she said to me and publicly, "I thought I had all these things taken care of." She's alone in the world, you understand. So we executed these things. She knew what she was doing. She had every necessary element of what was going on.

You would be surprised how that lady knows what these things are, but you hear all this other testimony and it sounds different. Not to us.

Respondent was later questioned by Hoch as follows:

Q Why did you have to do it [act for Sim] under a power of attorney, rather than having her do it herself?

A Well, I would say this. . . . A lot of powers of attorneys are given —

Q Is it because she is incompetent and can't do it herself?

A No, no.

Q All right.

A She's not incompetent.

Q Let me ask you this.

A I don't want to say that right now, but she wasn't at that time. No she wasn't incompetent. . . .

I have never been with her — After I would talk a little while with her she always answered me properly. I've got notes to show those kinds of answers.

Respondent also testified that the reason why Sim was not present before the court in the latter part of 1982 was because he "[didn't] think she needed it." When he was subsequently asked about financing the litigation, he testified that he paid some expenses out of his personal check "because I want to be fair

about this thing. I don't want to be cheating. Everybody knows that in this town. I don't cheat."

Sim did not attend a hearing held June 14, 1984, although she continued to be represented by Walker, Kent Neumeister, and the respondent. Again, the respondent was called as a witness by Hoch, and the following testimony was adduced:

Q. When Maude [Sim] received the petition for the appointment of a guardian or conservator over her, [respondent's wife testified] that she [Sim] was stressed or unhappy about it, and that at that time she was competent and able to handle her own affairs, and there was no need for a guardian or conservator to be appointed. Is that your recollection also?

A. That's exactly right. She was competent to do what she had to do, and she did do certain things that she had to do.

Q. You're of the opinion that was true, that she was competent and able and could, and you were confinced [sic] of that?

A. Certainly. Certainly.

The evidence is uncontroverted that respondent did not take any steps to withdraw from the case either before or after he testified. In fact, the only action taken regarding his conduct was a motion to disqualify filed late in the case by the Attorney General. That motion was overruled on appeal "without prejudice to such disciplinary sanction as may prove to be appropriate . . . ." *In re Guardianship and Conservatorship of Sim*, 225 Neb. 181, 205, 403 N.W.2d 721, 737 (1987).

At the disciplinary hearing before the referee held beginning January 24, 1989, Hoch testified that he had suggested to respondent that respondent withdraw his representation because he would be called as a witness in the case. Hoch explained that respondent was a prime witness and was called to testify because of his extensive knowledge of Sim's affairs, but he added that it was difficult to attack respondent's credibility because of their professional acquaintance.

Respondent testified at the disciplinary hearing that he was never aware that Sim's interest could be represented by other lawyers and that he did not advise her to seek independent

counsel. Although Walker was the lead attorney at trial, the respondent testified that he did act as "part of the trial attorney" in the case and was surprised to be called as a witness. However, he denied ever having been told by Hoch that he should withdraw from the case. We find that he had been so advised by Hoch. Respondent testified further that Sim placed total trust in him and if he had withdrawn, he believed it would have had an adverse mental effect on Sim. To support this argument, respondent offered the testimony of an expert in geriatric medicine, Dr. Jane Potter. The expert explained that the establishment of guardianships involves losses of personal autonomy and right of choice which can be emotionally and physically devastating for the older person.

With respect to the affidavits, the respondent testified that he prepared them as a substitute for the documents Sim executed on October 7, 1982, which he consistently maintained were confidential in nature. It is apparent from the respondent's testimony that he believes the affidavits pertained only to matters of formality, and, as the referee stated in her report, it is apparent that the respondent believes that he did nothing wrong in the case.

As stated in her report, the referee found that the affidavits of Harvey Neumeister were not intended to relate solely to an uncontested matter or to a matter of formality. The affidavits went to the heart of Sim's defense that a guardianship was unnecessary. That is, the respondent maintained at all times that the documents Sim executed on October 7 were confidential. Since Sim would not testify, the only information available concerning the defense that she was provided for was the information contained in the respondent's affidavits. Thus, the affidavits pertained to a substantive issue of the case, making the respondent's obligation to withdraw evident as early as November 1982, when the first affidavits were prepared. We agree with the referee's findings and find that respondent's affidavits were not intended to relate solely to formal or uncontested matters.

It is uncontroverted that the respondent was simultaneously an attorney of record and a witness who participated in the development of the facts in this case. The record indicates that

the respondent had personal knowledge of Sim's mental abilities because of their close and longstanding friendship. He also had professional knowledge of Sim's affairs because of the conveyances that occurred on October 7, 1982, when he became her trustee, because of the will he had drawn in 1980, and because of his long acquaintance with Sim. When coupling these facts with Sim's defense that a guardianship was unnecessary because Sim was already provided for, and in light of the fact that Sim herself was not going to testify, it is obvious that the respondent should have known that he was going to be called as a witness on this matter. The situation required his immediate withdrawal from the case.

The respondent contends that his testifying should be disregarded because he was not disqualified from the case and because his client was not prejudiced by his testimony. The fact that the trial court did not disqualify respondent, however, will not exonerate him from discipline where it is found that his conduct is in violation of disciplinary rules.

Insofar as respondent contends that there was no prejudice to Sim in respondent's acting as both attorney and witness, the following is pertinent. Sim's relatives sought the appointment of a guardian for Sim. Sim, through respondent, apparently took the position that there was no necessity for a guardian because Sim had executed an irrevocable trust. The viability of Sim's position depended on the competency of Sim at the time she signed what was purportedly an irrevocable trust. The relatives wanted a court answer to that question, and respondent took the firm position that that question need not be answered. Whether Sim was prejudiced or not depended on a court determination of that question.

Furthermore, the rationale for the advocate-witness rule is not solely limited to ensuring the effective representation of a client. An ethical consideration provides guidance as to other rationales for the advocate-witness rule:

> Occasionally a lawyer is called upon to decide in a particular case whether he will be a witness or an advocate. If the lawyer is both counsel and witness, he becomes more easily impeachable for interest and thus may be a less effective witness. Conversely, the opposing counsel may

>be handicapped in challenging the credibility of the lawyer when the lawyer also appears as an advocate in the case. An advocate who becomes a witness is in the unseemly and ineffective position of arguing his own credibility. The roles of an advocate and of a witness are inconsistent; the function of an advocate is to advance or argue the cause of another, while that of a witness is to state facts objectively.

EC 5-9.

The testimony the respondent provided on March 22, 1984, created some of the difficulties referred to above. The record reveals that the respondent did end up in the unseemly position of arguing his own credibility. By the same token, it is clear from Hoch's testimony that Hoch was placed in an awkward position of attacking the opposing counsel's credibility, which most likely created difficulty for the trier of fact in determining the weight to be given the testimony.

The rationale against the dual role was never more apparent than at the hearing on June 14, 1984. It almost goes without saying that the respondent's testimony at this hearing was material to the issue of the case, that being Sim's competency at the time of the filing of the petition. As an attorney of record, the respondent had the task of arguing his client's defense that a guardianship was unnecessary; as a witness, the respondent had the duty to state the facts objectively regardless of whether what was said helped or hindered his client's position. The facts indicate that the respondent should have left the trial of the case to other counsel. It is against sound principles of professional ethics for one who knows that he is to be called as a material witness in a case to appear as attorney therein. *Sinnett v. Albert*, 188 Neb. 176, 195 N.W.2d 506 (1972); *McCormick v. McCormick*, 150 Neb. 192, 33 N.W.2d 543 (1948).

Contrary to respondent's contention, the exception to the rule that allows an attorney to testify and continue representation where withdrawal would work a substantial hardship is not applicable under the circumstances. Although the expert witness testified generally to the physical and emotional effects a guardianship proceeding can have on an elderly person, the expert neither examined Sim personally, nor did the expert's testimony show how the respondent's

withdrawal would work a substantial hardship on the client. In addition, it is clear that respondent could have remained active in the case in his role of trustee. The alleged intangible value to Sim of respondent's presence would not be lost.

The referee found, and we agree, that the respondent admitted that he does not consider himself a trial lawyer. The referee added that "Kent Neumeister and William Walker were counsel of record along with Harvey Neumeister, and both were acquainted with Mrs. Sim and well versed in the theory of the case." Even though Walker was eventually replaced by J. Patrick Green as one of the attorneys representing Sim, this did not result in a hardship to her because Green admitted that he was fully updated on the case. All of the facts indicate that the respondent could have withdrawn without any hardship to the client.

When an attorney takes an oath of office and receives a license to practice law, he swears that he will observe the established standards of professional ethics and submits to the implied understanding that he will demean himself in a proper manner and abstain from practices that discredit himself, the courts, and the profession. *State ex rel. NSBA v. Hahn*, 218 Neb. 508, 356 N.W.2d 885 (1984). Violation of a disciplinary rule concerning the practice of law is a ground for discipline. See *State ex rel. NSBA v. Douglas*, 227 Neb. 1, 416 N.W.2d 515 (1987), *cert. denied* 488 U.S. 802, 109 S. Ct. 31, 102 L. Ed. 2d 10 (1988).

In determining what is appropriate discipline, consideration must be given to the nature of the offense, the need for deterring others, the maintenance of the reputation of the bar as a whole, the protection of the public, the attitude of the offender generally, and his present or future fitness to continue in the practice of law. *State ex rel. NSBA v. Kirshen*, 232 Neb. 445, 441 N.W.2d 161 (1989).

The question of the attitude of respondent is of serious moment in this case. The referee summed up the problem in her statement in her report, "His [respondent's] insistence that he did nothing wrong and would take all of the same actions again demonstrate [sic] both his sincerity and, unfortunately, his lack of understanding of the seriousness of the disciplinary

violations in which he participated."

The Disciplinary Review Board set out its conclusion in its report recommending the filing of formal charges in this case, in which report it is stated:

> Somewhere in the conduct of this case, Mr. Neumeister lost his capacity to view his actions in the case as being an advocate for his client and he himself became the client. This blurring of roles is one of the problems that can develop when the lawyer seeks to serve both as a witness and as an advocate. Towards the end of the litigation, i.e., just before the trial in March, of 1984, Mrs. Sim was no longer capable of assisting in the preparation of her case as is shown in the Nebraska Supreme Court opinion that was decided after the trial. Therefore Harvey Neumeister was serving in the role of client, attorney-in-fact, trustee and attorney for an incompetent client. There were, simply stated, to [sic] many hats to be worn and the result was a violation of the Code of Professional Responsibility.

The legal problems in this case before the Committee on Inquiry of the First Disciplinary District, the Disciplinary Review Board, the referee, and this court have been magnified by respondent's conduct throughout these disciplinary proceedings, as well as by his conduct during the ongoing battle in the *Sim* cases before the county court for Otoe County, the district court for Otoe County, and this court. The respondent testified before the referee in this case that he had counted the number of times he stayed up all night working on the case and that for 31 nights he, along with Sim's other attorneys, "never even went to bed." Respondent's all-consuming involvement in the *Sim* cases has led to the present position in which he now finds himself. That practice has resulted in an almost incalculable loss of time of many lawyers and judges in attempting to resolve the problems, real and imaginary, presented. Lost in the shuffle are the rights of an innocent, and now incompetent, client of respondent's. The whole legal process has been an effort under this state's laws to have Sim's rights determined in open court. Rightly or wrongly, relatives of Sim's have sought a hearing to have a guardian appointed for her, an elderly relative. Proceedings to bring light to, and to

open discussion of, legal problems possibly present in the close relationship between a lawyer and his client who may be mentally impaired can only lead to public confidence that lawyers do not take advantage of disabled clients. Respondent fought hard to prevent any such open proceedings, to the point where he became attorney advocate, client, and witness in legal proceedings. In the context of this case, respondent's conduct was improper.

We conclude that the appropriate measure of discipline in this case is suspension of respondent from the practice of law for 1 year, beginning January 15, 1990.

JUDGMENT OF SUSPENSION.